## Richmond

J. E. CLAYTON DAVIS, ET AL., ETC. v. FRANK A. DUSCH, ET AL., ETC.

November 30, 1964.

Record No. 5928.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

*Henry E. Howell, Jr. (Howell, Anninos & Daugherty,* on brief), for the petitioners.

*Harry Frazier, III* and *George W. Vakos, City Attorney (Archibald G. Robertson; Hunton, Williams, Gay, Powell & Gibson,* on brief), for the respondents.

CARRICO, J., delivered the opinion of the court.

This original petition for a peremptory writ of mandamus prays that this court order the present members of the city council of the city of Virginia Beach to redistrict the city and reapportion the seats on the council.

The petition was filed by J. E. Clayton Davis, of the borough of Lynnhaven of the city; Rolland D. Winters, of the borough of Bayside; Cornelius D. Scully, of the borough of Lynnhaven, and Howard W. Martin, of the borough of Kempsville, who sue on behalf of themselves and all other citizens of the city of Virginia Beach similarly situated, the petitioners, against Frank A. Dusch and the ten other members of the city council, the defendants.

The defendants have filed an answer, depositions have been taken and exhibits filed on behalf of each side to the controversy, and the matter has been orally argued before us. There are no facts in dispute and the record discloses the following situation:

The present city is composed of the old city of Virginia Beach and the county of Princess Anne. The new city resulted from the consolidation, effective January 1, 1963, of the two former governmental units and the geographical areas represented thereby, pursuant to the provisions of Article 4, Chapter 9, Title 15, Code of Virginia, 1950 (now Article 4, Chapter 26, Title 15.1).

A committee, composed of members appointed by the council of the old city and the board of supervisors of the county, undertook a study of a plan of consolidation.

The immediate motivating factor in the movement for consolidation, in the words of one witness, the co-chairman of the committee, was because Princess Anne County was, "under the gun of annexa-

tion" by the city of Norfolk. Also present was the fact that the old city desired to expand and, "it had to go out into Princess Anne County." The witness further said of the proposed consolidation of the two governmental units, "we thought it would be far better, we would have a more simplified government and a more economical government if they were united."

The committee decided to recommend a borough form of city government, under which a higher tax could be levied in those areas of the city which desired more services of government than were desired in the city as a whole. The committee formulated a plan of consolidation, set forth in a proposed consolidation agreement and a proposed charter, incorporating a borough form of government. All of this was presented to the two governing bodies concerned. The agreement was approved by each body and was executed on November 10, 1961. The agreement and the proposed charter were published four times in a newspaper published in the city of Virginia Beach, as required by Code, § 15-223, and once, for additional coverage, in a newspaper published in the city of Norfolk.

Pursuant to an order of the Circuit Court of Princess Anne County (Code, § 15-224), a referendum was held on January 4, 1962, in the old city and in the county which submitted to the voters therein this question:

"Shall Princess Anne County and the City of Virginia Beach consolidate?"

The proposed consolidation was approved in the election which produced a total vote comparable to a presidential election. In the county, 7,476 persons, or 81% of those voting, cast their ballots in favor of consolidation, and 1,759 against. In the old city, 1,539 persons, or 86% of those voting, favored the plan, with 242 expressing disapproval.

A charter incorporating the new city was enacted by the General Assembly at its 1962 session (Acts of Assembly, 1962, Chapter 147, page 204) in almost the same form as the proposed charter which was published prior to the election.

It is the provisions of the consolidation agreement and the charter relating to representation on the city council to which we must direct our attention. These provisions were contained in the recommendations made by the study committee appointed by the two former governing bodies.

The committee, in its undertaking, was confronted with a substantial problem in formulating a plan for representation on the new council. It recognized that, in order for consolidation to win approval, it would have to produce a plan which would be acceptable to the voters in the half of the county which was rural and to those in the half which was urban and which would, at the same time, win the support of the voters in the old city. The thinking of the members of the committee, according to its co-chairman, was, "that we ought not to make too much of a change" in representation until the citizens of the new city could study the matter and "pass on it."

The plan of representation, as formulated by the committee, contemplated seven boroughs in the new city. The council of the old city was composed of five members, elected at large. The plan proposed that the geographic limits of the old city would comprise one borough in the new city, with five members on the council, to be elected at large from that borough. The county was divided into six magisterial districts, with one member of the board of supervisors elected from each district. The plan proposed that the geographic limits of each magisterial district would comprise one borough in the new city, with one member on the council to be elected from each borough.

This plan was enacted into law in the charter and found its place in § 3.01 thereof. That section, in addition to providing for the composition of the council in accordance with the plan, also provided that the five members of the council of the old city and the six members of the board of the county, holding office immediately prior to the effective date of the charter, should constitute the council of the city and hold office until the beginning of the terms of their successors. The section also contained the following crucial language:

"At such time as may be determined by the affirmative vote of seven councilmen, which shall not be earlier than five years after the effective date of this charter but not later than September 1, 1971, the council shall submit to the qualified voters of the city a new plan for election of councilmen."

Section 3.02 of the charter provided for the manner and time of election of new members to the council to succeed those holding over after the effective date of the charter under Section 3.01.

The depositions and exhibits disclose the population of each of the districts represented by the boroughs of the new city, according to

the 1960 census, and the projected population of the same districts as of January 1, 1964, as follows:

| District | Population Per District 1960 | Projected Population Per District January 1, 1964 |
|---|---|---|
| Blackwater | 733 | 862 |
| Pungo | 2,504 | 2,806 |
| Princess Anne | 7,211 | 7,957 |
| Kempsville | 13,900 | 22,254 |
| Lynnhaven | 23,731 | 37,760 |
| Bayside | 29,048 | 36,027 |
| Virginia Beach | 8,091 | 10,473 |

The petitioners contend that the, "disparities in representation imposed upon residents of the Boroughs of Lynnhaven, Bayside and Kempsville by the Charter of the City of Virginia Beach, when related to the population of said districts," are violative of the Fourteenth Amendment to the Constitution of the United States, and of the Constitution and statutes of Virginia. This, they say, entitles them to a writ, "directing the Council of the City . . . to reapportion representation so as to afford equal representation in proportion to the population of each borough" and to make provision, "to promptly conduct elections for the selection of the newly apportioned City Council."

At the outset, we are met with the contention of the defendants that mandamus is not available to the petitioners as a remedy for their alleged grievances. The defendants say that they do not possess the power and, hence, cannot be compelled, by mandamus, to reapportion the city.

The petitioners argue that mandamus is available to them because the defendants have the authority and are under a duty to reapportion because of the provisions of two Code sections enacted pursuant to § 121 of Article VIII of the Constitution of Virginia, namely: Code, §§ 15.1-803 and 15.1-806.

Section 121 of the Constitution, insofar as it is pertinent here, reads as follows:

"§ 121. *City council, composition, how elected, powers and duties, ineligibility of members to certain offices; powers and duties as to reapportionments; when mandamus against council lies.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"The council of every city may, in a manner prescribed by law, increase or diminish the number, and change the boundaries, of the wards thereof, and shall, in the year nineteen hundred and thirty-three, and in every tenth year thereafter, and also whenever the boundaries of such wards are changed reapportion the representation in the council among the wards in a manner prescribed by law; and whenever the council of any such city shall fail to perform the duty so prescribed, a mandamus shall lie on behalf of any citizen thereof to compel its performance."

Code, §§ 15.1-803 and 15.1-806 are general statutes under Article 2, Chapter 16 of Title 15.1, styled "Provisions Affecting Cities Only." Code, § 15.1-803, insofar as it is pertinent here, provides that whenever, by the last United States census or other enumeration made by authority of law, it shall appear that the population in any ward of a city exceeds that of any other ward by so much as 3,000 inhabitants, or whenever in the opinion of the council it is necessary, the council shall redistrict so that no one ward shall exceed any other ward in population by more than 3,000 inhabitants. The Code section provides that mandamus shall lie to compel performance of the duty imposed thereby.

Code, § 15.1-806, insofar as it is pertinent here, provides that the council of every city shall, in the year 1953 and every tenth year thereafter, reapportion the wards of the city so as to give, as far as practicable to each ward, equal representation in the council and in each branch thereof in proportion to the population of each ward.

Code, § 15.1-807 provides that mandamus shall lie to compel performance of the duty imposed by Code, § 15.1-806.

The defendants assert that the city council was not created under the provisions of § 121 of Article VIII of the Constitution, but by special act adopted pursuant to § 117 of Article VIII, and that Code, §§ 15.1-803 and 15.1-806 do not, therefore, apply to the situation at hand.

Section 117 of the Constitution, insofar as it is pertinent here, reads as follows:

"§ 117. *General Assembly shall enact laws for government of cities and towns; how special act therefor passed; as to city charters existing at adoption of Constitution.*

. . . . . . . . . . . . . . .

"(b) The General Assembly may, by general law or by special act (passed in the manner provided in article four of this Constitution)

provide for the organization and government of cities and towns without regard to, and unaffected by any of the provisions of this article . . . ."

In deciding this controversy, it would be well to reexamine the principles applicable to mandamus in a situation of this kind. Mandamus is available to compel the performance of an administrative or ministerial act by a public official only where there is a clear legal duty upon him to act. The writ cannot be used as a vehicle to create new powers, to impose new duties, or to enlarge upon those whose limitations are already fixed and definite. The relief provided by mandamus is awarded, not as a matter of right, but in the exercise of sound judicial discretion. And it is never granted in doubtful cases. *Gilliam* v. *Harris,* 203 Va. 316, 318, 124 S. E. 2d 188; *Richmond-Greyhound Lines* v. *Davis,* 200 Va. 147, 151, 152, 104 S. E. 2d 813; 55 C. J. S., Mandamus, § 51, pp. 87, 88; 34 Am. Jur., Mandamus, § 62, pp. 851, 852.

In determining whether mandamus is applicable in this case, the question is not whether disproportionate representation, which might need correction, does, in fact, exist in the city. The question is whether the city council has the authority and is under the duty to provide such correction. And the answer to that question lies in deciding whether Code, §§ 15.1-803 and 15.1-806 control the council's action or whether the city charter binds the council to act only according to its terms.

The defendants concede that if Code, §§ 15.1-803 and 15.1-806 are applicable, mandamus would be the proper remedy for redress of the petitioners' alleged grievances. The defendants say, however, that the charter controls and that the council now has no authority and cannot now be compelled to reapportion. This is so, the defendants argue, because the charter specifically fixes the date on which the council may first exercise such authority as of January 1, 1968, and fixes the date by which it must so act as of January 1, 1971.

The crucial question then becomes, did the legislature have the power to say to the city council, as it did in the charter, that its authority with relation to reapportionment would not take effect until January 1, 1968, and thus, in this respect, differ from the authority granted to cities generally by Code, §§ 15.1-803 and 15.1-806? It is our opinion that this question should be answered in the affirmative.

The city charter was enacted by the legislature pursuant to the

authority of § 117 of the Constitution which, as has been seen, grants it the power to provide by special act for the organization and government of cities and towns. It must be conceded that a provision for the composition of a council relates directly to the organization and government of a city. *Pierce* v. *Dennis*, 205 Va. 478, 486, 138 S. E. 2d 6.

Section 117 of the Constitution provides that the authority there vested in the legislature to enact special laws with regard to cities shall be, "unaffected by any of the provisions of this article," that is, Article VIII, entitled, "Organization and Government of Cities and Towns." Section 121 of the Constitution, upon which the petitioners rely to base their claim to relief under Code, §§ 15.1-803 and 15.1-806, is, itself, a part of Article VIII of the Constitution. Thus, legislation enacted pursuant to the special powers granted to the legislature in § 117 is unaffected by the provisions of § 121.

As related to the case before us, we see that § 121 provides for the reapportionment of the seats on the councils of cities every ten years after 1933 and Code, §§ 15.1-803 and 15.1-806 give effect to the provisions of that constitutional section. If applicable to the city, these provisions would have required, as the petitioners assert, a reapportionment of the city in 1963, immediately after its inception on January 1 of that year.

But the legislature, obviously recognizing that the formation of the city was to be effective in the decennial year set forth in § 121 of the Constitution and Code, § 15.1-806, said, in the charter, that the city need not reapportion in that year. It provided, instead, that the city could reapportion five years after the effective date of the charter and that it must do so before the end of eight years thereafter.

In so doing, the legislature, with the force of § 117 behind its action, said that the authority and duty of the city to reapportion were to be different from and to be unaffected by the provisions for reapportionment of cities generally, as set forth in § 121 and Code, §§ 15.1-803 and 15.1-806.

That it is within the power of the legislature so to provide specially for the organization and government of cities and towns has long been recognized by this court. Beginning with *Miller* v. *Pulaski*, 109 Va. 137, 63 S. E. 880, and continuing through *Pierce* v. *Dennis, supra*, we have consistently upheld special legislation applicable to cities and towns, enacted pursuant to § 117, which was at variance with other provisions of Article VIII of the Constitution and with general statutes antedating such special legislation. See *Fallon Florist* v. *City*

*of Roanoke,* 190 Va. 564, 58 S. E. 2d 316; *City of Portsmouth* v. *Weiss,* 145 Va. 94,. 133 S. E. 781; *Town of Narrows* v. *Giles County,* 128 Va. 572, 105 S. E. 82; *Chambers* v. *City of Roanoke,* 114 Va. 766, 78 S. E. 407.

Nor is the special legislation here under consideration invalid because of those provisions of § 63 of the Constitution, which prohibit special laws, "for conducting elections or designating the places of voting." As we said in *Porter* v. *Joy,* 188 Va. 801, 805, 51 S. E. 2d 156, § 63, "refers to the manner in which an election is conducted." We are not concerned in this case with the manner of conduct of an election. Our concern is whether the city council has the power to reapportion itself and has the authority to order the election of a new council—an entirely different matter from that envisioned by § 63.

It is the city charter, then, and it alone, to which we must look for the authority and duty of the council to reapportion the city. Upon that examination, it is crystal clear that the council now has no such authority and there cannot now be imposed upon it the duty to reapportion.

Moreover, there are other considerations which dictate the decision to be made here. The public interest is inextricably involved in this case, and we must not take any action which would be harmful thereto.

As has been said,. mandamus is to be granted or denied in the exercise of sound judicial discretion. That discretion is the scale upon which are to be weighed the possible results which would flow if the writ is improvidently granted or denied.

Here, we have a new city just emerging from the governmental structures of a former municipality and a former county. We must consider, as the legislature surely did, that that union posed difficult and unique problems which required special provisions in the legislation giving life to the new city—provisions which were essential to meet and surmount objections which might have prevented the consolidation. One would have to be naive, indeed, to believe that if those special provisions had not been granted the formation of the city would, notwithstanding, have still resulted.

We must recognize that if there now be disproportionate representation on the city council, the legislature has provided, in the charter, specific provisions for the correction thereof. And then, too, the legislature itself may provide earlier relief.

We must be aware, after viewing and weighing all of the considerations upon which the city was founded, that to order now a reapportionment of the city and the election of a new council might be to strike the blow which would cause the new city to die a-borning. Under such circumstances, the exercise of sound judicial discretion does not sanction the action here sought.

For the reasons given, the relief prayed for will be denied.

*Mandamus denied.*