James M. Thomson, et al., etc.

v.

Charles S. Robb, Governor of Virginia, et al.

Record No. 850171

Decided March 29, 1985, at Richmond

Present: All the Justices

*William Griffith Thomas (Walter A. Marston, Jr.; S. Miles Dumville; David B. Irvin; Thomas & Fiske, P.C.*, on briefs), for petitioner.

*William G. Broaddus, Chief Deputy Attorney General (Gerald L. Baliles, Attorney General; John S. Morriss, III, Assistant Attorney General; William J. Bridge, Assistant Attorney General*, on briefs), for respondent.

CARRICO, C.J., delivered the opinion of the Court.

On March 5, 1985, James M. Thomson and A. L. Philpott, Speaker of the House of Delegates (the petitioners), filed in this Court an original petition for a writ of mandamus against Charles S. Robb, Governor of Virginia, and Laurie Naismith, Secretary of the Commonwealth (the respondents). The petitioners seek a writ of mandamus compelling the Governor to commission Thomson a member of the State Corporation Commission (the Commission or SCC) and requiring the Secretary of the Commonwealth to administer to Thomson the oath of office.

The facts giving rise to the present controversy are not in dispute. On January 30, 1985, pursuant to a joint resolution, the General Assembly proceeded to consider the selection of a member of the Commission to fill the unexpired term of Junie L. Bradshaw. Two persons, James M. Thomson and Edward E. Lane, were nominated for the position.

Thomson received 86 affirmative votes in the House of Delegates and 13 in the Senate. Lane received 12 affirmative votes in the House and 26 in the Senate. Hence, Thomson received a majority of the votes in the House and Lane a majority in the Senate. Thomson's combined count, however, totalled 99 votes to Lane's 38.

Based upon the combined total, the Speaker of the House of Delegates declared that Thomson, "having received a majority of the votes cast by the joint vote of the two houses of the General Assembly, was . . . a duly elected member of the State Corporation Commission." The Clerk of the House of Delegates notified the Governor that Thomson had been elected a member of the Commission. The Clerk of the Senate, however, notified the Governor that, because neither nominee had received " 'the vote of a majority of the members elected to each house of the General Assembly, there has been no election of a member of the State Corporation Commission.' "

On February 27, 1985, citing an opinion of the Attorney General dated February 1, 1985,[1] and noting Thomson's failure to receive "a majority vote in each House of the General Assembly," the Governor declined to commission Thomson a member of the Commission. The next day, the Secretary of the Commonwealth denied Thomson's request to administer him the oath of office. The present petition for mandamus was filed a few days later.

The dispositive question in the case is whether the election of a member of the Commission requires, as the petitioners contend, a majority of the combined vote of the two houses of the General Assembly or, as the respondents contend, a majority vote in each house. Resolution of this question involves application of art. IX, § 1 of the Constitution of Virginia. In pertinent part, that constitutional section provides:

There shall be a permanent commission which shall be known as the State Corporation Commission and which shall consist of three members. . . . *Members of the Commission shall be elected by the General Assembly* and shall serve for regular terms of six years. . . . Whenever a vacancy in the

---

[1] In his opinion of February 1, 1985, the Attorney General stated that the election of a member of the State Corporation Commission required "a majority vote in each house of the General Assembly." A previous Attorney General had rendered an opinion to the same effect in 1972.

Commission shall occur or exist when the General Assembly is in session, *the General Assembly shall elect a successor for such unexpired term.* If the General Assembly is not in session, the Governor shall forthwith appoint pro tempore a qualified person to fill the vacancy for a term ending thirty days after the commencement of the next regular session of the General Assembly, and *the General Assembly shall elect a successor for such unexpired term.* [Emphasis added.]

Also involved is Code § 12.1-6, which provides in pertinent part:

The Commission shall consist of three members. *Members of the Commission shall be elected by the joint vote of the two houses of the General Assembly* for regular staggered terms of six years. . . .
Whenever a vacancy in the Commission shall occur or exist when the General Assembly is in session, *the General Assembly shall elect a successor for such unexpired term.* If the General Assembly is not in session, the Governor shall forthwith appoint pro tempore a qualified person to fill the vacancy for a term ending thirty days after the commencement of the next regular session of the General Assembly, and *the General Assembly shall elect a successor for such unexpired term.* [Emphasis added.]

The petitioners present an extensive review of the history of art. IX, § 1 of the Constitution and Code § 12.1-6.[2] This review shows that the State Corporation Commission was created by § 155 of the Constitution of 1902, which provided for the appointment of commissioners by the Governor, "subject to confirmation by the General Assembly in joint session." Section 155 also allowed the General Assembly, after January 1, 1908, to provide for "the election of the members of the commission by the qualified voters of the State." Code § 1313(a)(2), adopted incident to approval of the 1902 Constitution, provided for confirmation of SCC members by the General Assembly, "in joint session."
In 1918, the General Assembly adopted legislation providing for the election of commission members "by the qualified voters of the State." Acts 1918, ch. 55. Popular election of commissioners con-

---

[2] See *Norris v. Gilmer*, 183 Va. 367, 374-77, 32 S.E.2d 88, 91-92 (1944), for the historical background of these sections up to 1944.

tinued until 1926, when the General Assembly again provided for the appointment of commissioners by the Governor, "subject to the confirmation of the [G]eneral [A]ssembly, in joint session." Acts 1926, ch. 37.

Also in 1926, a commission was appointed to recommend changes in the then current Constitution. Acts 1926, ch. 481. The commission recommended that § 155 of the Constitution, relating to the selection of SCC commissioners, remain unchanged. This recommendation, however, failed to secure the approval of the General Assembly. The House of Delegates approved an amendment which provided that "commissioners shall be elected by the General Assembly in joint session." H. Jour., Ex. Sess. 1927, at 92. The Senate amended the House version to provide that commissioners be "appointed by the Governor, subject to confirmation by the General Assembly, or elected by the General Assembly, as may be provided by law." S. Jour., Ex. Sess. 1927, at 227. Conferees appointed by the two houses finally agreed upon an amendment which was adopted by both houses. S. Jour., Ex. Sess. 1927, at 291-92; H. Jour., Ex. Sess. 1927, at 307. The amendment, which became part of § 155 effective in 1928, provided that SCC members "shall be elected by the [G]eneral [A]ssembly," the same language that now appears in art. IX, § 1, quoted above.

The statutory provision calling for the election of SCC commissioners by "the joint vote of the two houses of the General Assembly" first found its way into the Code in a 1944 amendment to then Code § 3694. Later codified as § 12-9, the language was retained in the statutory enactment incident to adoption of the 1971 revision of the Constitution and is now contained in § 12.1-6, quoted earlier.

The petitioners also submit a comprehensive review of the actual manner in which they say elections of SCC commissioners were conducted during the period between the 1928 amendment to § 155 of the Constitution and the constitutional revision in 1971. During that period, the petitioners assert, "there was never a distinction between those votes cast in the Senate and those cast in the House, and the number required for election was always one more than half of the combined total votes cast."[3]

---

[3] The petitioners state that the House and Senate journal records documenting the various SCC elections since the constitutional revision of 1971 have been "inconsistent."

The petitioners then point out that the official report of the Commission on Constitutional Revision, which preceded adoption of the 1971 Constitution, recommended no change in the basic structure of the SCC and stated the intent to leave intact those provisions "dealing with membership, terms of office, and manner of selection." In fact, the petitioners say, the 1928 language of § 155, *viz.*, "[t]he commissioners shall be elected by the [G]eneral [A]ssembly," was carried forward into art. IX, § 1 of the present Constitution. When this action is coupled with the General Assembly's reenactment of the "joint vote of the two houses" language in Code § 12.1-6 and both actions are viewed in their historical perspective, the petitioners submit, there emerges the clear intent to retain the manner of selecting SCC commissioners whereby "the votes cast in both the House and Senate were always combined, and the number necessary to election was always one more than half of those votes cast."

The petitioners contend that Code § 12.1-6 is at the very heart of this case. Citing *Quesinberry* v. *Hull*, 159 Va. 270, 274, 165 S.E. 382, 383 (1932),[4] the petitioners argue that the General Assembly "does not function under a grant of power" and "may do those things . . . which are not forbidden to it by the Constitution."[5] The petitioners say that the language of art. IX, § 1 of the Virginia Constitution, *viz.*, "[m]embers of the Commission shall be elected by the General Assembly," merely provides a general constitutional framework for the election of SCC commissioners and does not work a limitation upon the General Assembly's authority to specify the method by which it shall conduct such elections. The General Assembly acted within its authority, therefore, the petitioners conclude, when it specified in Code § 12.1-6 that commissioners should be elected by "the joint vote of the two houses of the General Assembly."

The constitutional provision in art. IX, § 1, however, and not Code § 12.1-6, is at the heart of this case. The Code section is

---

[4] *Quesinberry* involved an act of the General Assembly providing for the popular election of a trial justice in Carroll County. The question was whether the act constituted special legislation.

[5] The petitioners do not quote fully from *Quesinberry*; they omit the italicized language in the following excerpt: "The legislature functions under no grant of power. It can do those things which are not forbidden by the State or Federal Constitutions, *or which are not repugnant to those elementary social rights upon which society, as we know it, rests.*" 159 Va. at 274, 165 S.E. at 383.

of secondary importance; it receives consideration only if the constitutional provision in issue is not a limitation upon legislative authority or is ambiguous. And, while the petitioners' historical review is interesting, it is relevant only if the constitutional language in question is indeed ambiguous. Courts follow the rule that, if a constitutional provision is free of ambiguity, construction is impermissible and resort to legislative history or other extrinsic evidence is not allowed. *Harrison* v. *Day*, 200 Va. 439, 448, 106 S.E.2d 636, 644 (1959); *Town of South Hill* v. *Allen*, 177 Va. 154, 164, 12 S.E.2d 770, 773-74 (1941).

We are of opinion that the language of art. IX, § 1 constitutes an unambiguous limitation upon the authority of the General Assembly with respect to the manner in which SCC commissioners are selected. The constitutional section states that "[m]embers of the Commission shall be elected by the General Assembly." The General Assembly is a bicameral body; "[t]he legislative power of the Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and House of Delegates." Va. Const. art. IV, § 1. In Virginia's bicameral legislature, no law shall be enacted except by bill and no bill shall become law unless "upon its final passage a vote has been taken thereon in each house . . . and a majority of those voting in each house . . . recorded in the affirmative." Va. Const. art. IV, § 11(d).

The petitioners argue, however, that while bicameralism may require a separate, majority vote of each house where the passage of a statute is involved, this proposition "does not hold true where the legislators are acting as electors for purposes of selecting persons for the judiciary and for other public offices." If the proposition is valid, the petitioners assert, it "is being uniformly violated at both the federal and state level[s] throughout the United States with regard to the election of judges and other public officials."

The petitioners say that, at the federal level, while the United States Constitution provides in art. II, § 2 for the appointment of justices of the Supreme Court by the President, with the advice and consent of the Senate, "the Constitution is silent" with respect to the selection of circuit and district judges, and the manner of their selection is determined by statute. The petitioners misread the Constitution, however; it is not silent with respect to the selection of federal circuit and district judges.

These judges are judges of "inferior courts," as provided in art. III of the Constitution. Section 1 of this article states in part that

"[t]he judicial power of the United States, shall be vested in one supreme court, and in *such inferior courts as the Congress may from time to time ordain and establish*" (emphasis added). Article II, § 2 of the Constitution provides in pertinent part that the President shall "nominate, and by and with the advice and consent of the Senate, shall appoint . . . judges of the Supreme Court, *and all other officers of the United States, whose appointments are not herein otherwise provided for*, and which shall be established by law" (emphasis added). United States circuit and district judges are among the "other officers of the United States" enumerated in art. II, § 2:

> It is conceded, of course, that a United States [Circuit or] District Judge is a judge of an "inferior" court within the meaning of the term employed in Article III; and that such judges must be appointed by and with the advice and consent of the Senate as provided by Article II, Section 2.

*United States* v. *Allocco*, 305 F.2d 704, 708 (2d Cir. 1962), *cert. denied*, 371 U.S. 964 (1963).

The petitioners also say that in seven states, other than Virginia, where the legislature is involved in the selection of judges, not one requires a separate majority vote of each house of the legislature. But we find that in six of the instances cited, Delaware, Hawaii, Maryland, New Jersey, New York, and Vermont, constitutional provisions, not just statutory enactments, clearly permit other than bicameral selection of the particular judges involved.

The Constitution of the seventh state cited, South Carolina, provided that circuit judges "shall be elected by 'joint ballot' of the General Assembly."[6] In *State* v. *Shaw*, 9 S.C. 94 (1877), the South Carolina Supreme Court considered the "joint ballot" provision in a proceeding involving the removal of a circuit judge. The judge had been elected by *viva voce* vote of the legislature in accordance with a general constitutional provision requiring that in "all elections by the General Assembly, or either house thereof, the members shall vote *viva voce*." *Id.* at 135. The question was whether the words " 'by joint ballot' " meant " 'by joint vote' " so that the election of judges could be conducted "by voting *viva*

---

[6] S.C. Const. art. IV, § 13.

*voce." Id.* at 137. The court answered the question in the negative and removed the judge in question.

The petitioners state that in *Shaw*, the court indicated there was no doubt that the term "joint ballot" meant "a judge was elected by the combined vote of the two houses of the South Carolina General Assembly, and not by the separate vote of each house." This may be true, but the court said that the word "joint" in the phrase "joint ballot of the General Assembly" modified the term "General Assembly" and not the word "ballot." *Id.* at 135. Hence, a "joint Assembly" was required by the constitutional language. We fail to see how this conclusion helps the petitioners in this case. The General Assembly of Virginia did not meet in "joint Assembly," or joint session, when it conducted the election at issue, and there is no contention an election in joint session was authorized. Be that as it may, Code § 12.1-6, and not the Constitution, uses the word "joint" in this case.

Petitioners also cite *Richardson* v. *Young*, 122 Tenn. 471, 125 S.W. 664 (1909), and *Snow* v. *Hudson*, 56 Kan. 378, 43 P. 260 (1896). In *Richardson*, a Tennessee statute provided that members of the state board of elections " 'shall be elected by the joint vote of both houses of the general assembly.' " *Id.* at 486, 125 S.W. at 666. The court said this provision authorized the members of the General Assembly to exercise "the appointing power by legislative act, or in joint session of the members of the two houses," *id.* at 516, 125 S.W. at 674, in which joint session all members would have "the same authority and only one vote." *Id.* at 539, 125 S.W. at 680. Importantly, the Tennessee Constitution provided that " '[t]he election of all officers and the filling of all vacancies not otherwise directed or provided by this constitution shall be made in such manner *as the legislature shall direct.*' " *Id.* at 504, 125 S.W. at 671 (emphasis added).

In *Snow*, a state statute required the concurrence of a majority of the members elected to each house of the legislature for the election of a state printer. The court declared the act invalid because in derogation of a constitutional section which provided that the state printer "shall be elected by the legislature in joint session." 56 Kan. at 383, 43 P. at 261. The court stated that the term "joint session" has "a well-recognized meaning, and implies the meeting together and commingling of the two houses, which, when so met and commingled, act as one body." *Id.* at 386-87, 43

P. at 262. But, here again, a specific constitutional provision required unicameral action.

Thus, in each instance cited by the petitioners, some constitutional provision permitted other than bicameral action in the legislative election of public officials. The authorities cited, therefore, fail to support the petitioners' argument that where a constitution provides for the election of public officials by a bicameral legislature, the legislature by statute may permit such election by some method different from the majority vote of each house.

The petitioners urge, however, that "the 'bicameral vote' method contended for by respondents should not be held to apply by presumption, but should only apply in instances where such method of election is expressly provided for, as is the case in the Virginia Constitution with regard to the election of the judiciary." Here, the petitioners point to Va. Const. art. VI, § 7, which provides that justices of the Supreme Court and judges of all other courts of record "shall be chosen by the vote of a majority of the members elected to each house of the General Assembly." This provision indicates, the petitioners say, that when the framers of the constitution intended to require bicameral action, they knew how to express such intent clearly.

We do not rely upon any presumption, however, in concluding that bicameral action is required in the selection of SCC commissioners. The conclusion is apparent from the face of the Constitution when it provides in art. IV, § 1 that the General Assembly shall be bicameral in nature and provides in art. IX, § 1 that "[m]embers of the Commission shall be elected by the General Assembly." And, as indicated earlier, since art. IX, § 1 imposes a limitation upon the authority of the General Assembly in the manner of selecting SCC commissioners, the burden is upon the petitioner to show that a specific constitutional provision permits selection other than by bicameral action, rather than upon the respondents to show that the bicameral "method of election is expressly provided for." The petitioners, of course, can point to no such specific constitutional provision.

Furthermore, we note that when the framers intended to require other than bicameral action, they knew how to express such intent. Article V, § 2 provides for the election of the Governor "by the qualified voters of the Commonwealth" and states that "[t]he person having the highest number of votes shall be declared elected; but if two or more shall have the highest and an

equal number of votes, one of them shall be chosen Governor *by a majority of the total membership of the General Assembly*" (emphasis added).

■ Finally, the petitioners argue that if the Constitution requires bicameral action in the selection of SCC commissioners, the requirement was satisfied when a majority vote of the members of each house resulted in the enactment of Code § 12.1-6. The ready answer to this argument is that it suggests the Constitution may be amended, without the participation of the voters, as long as the amendment receives the favorable vote of the majority of the members of each house.

Because we find that the election of a member of the State Corporation Commission requires a majority vote of the members of each house of the General Assembly and because James M. Thomson did not receive the required vote, the petitioners are not entitled to the relief requested. Accordingly, we will deny them a writ of mandamus.

*Writ denied.*[7]

---

[7] The dissent questions why, if the majority is correct, the limiting language is necessary in the judicial article, art. VI, § 7. The Report of the Commission on Constitutional Revision supplies the answer to that question. At page 199 of the Report, following proposed art. VI, § 7, a comment notes that the words, " 'the joint vote of the two houses,' " which appeared in § 91 of the judicial article of the old Constitution, have been replaced in proposed art. VI, § 7 with the words, " 'a majority of the members elected to each house.' " The comment then states:

The reason for the change is to clarify an ambiguity. The [§ 91] language is subject to the interpretation that the two houses must vote together and a majority of the total vote would suffice for election. . . . What is of course meant by the [§ 91] language, however,—and made explicit by the substituted language—is that a majority in each house vote favorably.

The "joint vote of the two houses" language of § 91 of the old Constitution, criticized as ambiguous in the foregoing comment, is, of course, the exact language of present Code § 12.1-6, upon which the dissent would solely rely to issue a writ of mandamus in this case. But "[m]andamus is available to compel the performance of an administrative or ministerial act by a public official only where there is a clear legal duty upon him to act." *Davis* v. *Dusch*, 205 Va. 676, 682, 139 S.E.2d 25, 29 (1964). Query: Even if we could rely upon a statute in this case, if the "joint vote" language in old § 91 was ambiguous, as, indeed, it was, why is not the same language ambiguous in Code § 12.1-6 and, therefore, insufficient to establish the "clear legal duty" predicate to the issuance of a writ of mandamus?

COMPTON, J., dissenting.

The majority's logic is flawed. I cannot agree with the proposition espoused for the Court that simply because Virginia has a bicameral legislature, selection of SCC commissioners must be accomplished by a separate election in each house, under a general constitutional mandate that provides: "Members of the Commission shall be elected by the General Assembly . . . ." The conclusion drawn does not flow reasonably from the basic premise.

Furthermore, I disagree with the idea that the foregoing broad and expansive constitutional provision operates as a *limitation* upon the authority of the General Assembly.

> "It is the settled law of this State that, outside of the powers ceded to the Federal government, the power of the General Assembly to enact statutes is without limit, except as restrained by the Constitution of the State. The Constitution of the State is a restraining instrument, and not a grant of power. If there be any restraints by implication, the restraint must be so necessary and so plainly manifest as to require the implication in order to enforce the restraints expressly imposed." *Breckenbridge* v. *County School Board*, 146 Va. 1, 5-6, 135 S.E. 693, 695 (1926).

Here, there is no express restraint on the power of the legislature to enact Code § 12.1-6, providing for selecting SCC commissioners by the joint vote of the two houses, and no such restraint is necessarily implied. This conclusion is buttressed by the fact that the framers demonstrated the ability, and found it necessary, to limit expressly the power of the legislature with regard to the election of the judiciary by providing in article VI, section 7, of the Constitution that judges "shall be chosen by the vote of a majority of the members elected to each house of the General Assembly." If the majority is correct, why is the limiting language in the judicial article necessary?

I would issue a writ of mandamus.

STEPHENSON and RUSSELL, JJ., join in dissent.