## CIRCUIT COURT OF THE CITY OF RICHMOND

Reid Scott,
an infant, et al.

   v.

Commonwealth of Virginia,
Board of Education of Virginia,
James W. Dyke, Jr., and
Joseph A. Spagnolo

November 20, 1992

Case No. HC-77-1

BY JUDGE MELVIN R. HUGHES, JR.

In this case, the complainants seek declaratory and injunctive relief in their claims that the Virginia Constitution mandates equal expenditures in all school districts throughout Virginia. They question as unconstitutional Virginia's statutory scheme of public school financing on the ground that it makes for substantial disparity in educational opportunities.

The complainants are eleven public school students and seven local school boards. The respondents are the Commonwealth of Virginia, the Board of Education of Virginia, the Secretary of Education of Virginia, and the Superintendent of Public Instruction. The respondents have filed a Demurrer challenging whether the Virginia Constitution actually requires equality of expenditures for public education. They also challenge (1) whether the courts are the proper forum to deal with questions of school funding, saying that the General Assembly has the ultimate authority on these questions, (2) whether they are proper parties because they lack any authority to decide school financing questions, (3) whether suit can be brought against them because they have immunity, and (4) whether the complainant school boards have any authority to bring this action against the Commonwealth of Virginia.

More specifically, complainants assert that the current financing system in use in Virginia "violates the Constitution of Virginia by

denying the student complainants and other children, who attend public school in the school divisions of complainant school boards, an educational opportunity *substantially equal to that of children who attend public school in wealthier divisions.*" (Emphasis supplied.) In line with this assertion, complainants say that school "divisions with low fiscal capacities, including complainant school divisions, have less funding per pupil for the education of pupils residing in those divisions than do divisions with high fiscal capacities."

In their brief in opposition, complainants summarize facts in the Bill of Complaint they allege are developed from the last year data was available which highlight disparities as follows:

1. *State and local funding for general education in Virginia is 2½ times greater in certain school divisions than in others, ranging from $2,895 per pupil to $7,268 per pupil;*

2. The average salaries for classroom teachers is 39% higher in certain localities than in others, ranging from $27,471 in the ten poorest school divisions to $38,095 in the ten wealthiest school divisions;

3. The ten wealthiest school divisions have an average instructional personnel to pupil ratio which is 24% higher than the ratio in the ten poorest school divisions, ranging from 81.8 instruction personnel per thousand pupils in the former to 66.2 instructional personnel per thousand pupils in the latter;

4. Spending for instructional materials is almost 12 times greater in certain school divisions than in others, ranging from $17.52 per pupil to nearly $208 per pupil, and spending for library books and supplies is more than 22 times greater in certain divisions than others, ranging from $2.22 per pupil to almost $50 per pupil; and

5. The disparity in State and local funding between the highest-funded and lowest-funded school divisions has widened, increasing by almost 14% between the 1987–88 and the 1989–90 school years, from $3,844 per pupil to $4,372 per pupil.

Complainants also allege that disparity makes for differences qualitatively in other ways:

33. Divisions with high fiscal capacities have instructional programs with greater breadth and depth in, among other

areas, mathematics, science, social studies, languages, art and music than divisions with low fiscal capacities. Public high schools in divisions with low fiscal capacities have fewer course electives, fewer advanced placements courses, fewer foreign languages, and a narrower range of science and math offerings than divisions with high fiscal capacities.

Both sides in the case agree that there are at least two provisions of the Virginia Constitution that apply to resolving the questions raised by the Demurrer. The first of these is Article I, Section 15, mentioning an "effective system of education."

*Qualities necessary to preservation of free government.* That no free government, nor the blessings of liberty, can be preserved to any people, but by a firm adherence to justice, moderation, temperance, frugality, and virtue; by frequent resurgence to fundamental principles; and by the recognition by all citizens that they have duties as well as rights, and that such rights not be enjoyed save in a society where law is respected and due process is observed.

That free government rests, as does all progress upon the broadest possible diffusion of knowledge, and that the Commonwealth should avail itself of those talents which nature has sown so liberally among its people by assuring the opportunity for their fullest development by an *effective system of education throughout the Commonwealth.* (Emphasis supplied.)

The second is Article VIII, Section 1, dealing with, pertinently again, a "system" of public education which in this provision is to exist "throughout the Commonwealth."

*Public schools of high quality to be maintained.* The General Assembly shall provide for a *system* of free public elementary and secondary schools for all children of school age *throughout the Commonwealth* and shall seek to ensure that an educational program of high quality is established and continually maintained. (Emphasis supplied.)

There is also Article VIII, Section 2, which assigns responsibility for determining the Standards of Quality. The respondents rely on this provision and argue that the Commonwealth of Virginia is responsible for only minimum education standards, and the Virginia Constitution reserves to the General Assembly the manner by which

funds are allocated to meet those standards. Article VIII, Section 2, reads:

> *Standards of quality; State and local support of public schools. Standards of quality* for the several school divisions shall be determined and prescribed from time to time by the Board of Education, subject to revision only by the General Assembly.
>
> *The General Assembly shall determine the manner in which funds are to be provided for the cost of maintaining an educational program meeting the prescribed standards of quality* and shall provide for the apportionment of the cost of such program between the Commonwealth and the local units of government comprising such school divisions. Each unit of local government shall provide its portion of such cost by local taxes or from other available funds. (Emphasis supplied.)

On Demurrer, the Court takes the allegations in the Bill of Complaint as true as well as the reasonable inferences from them. *Bowman v. Bank of Keysville*, 229 Va. 534, 539 (1985). The question arises whether equality in funding is actually mandated by these provisions in Virginia's Constitution.

On July 1, 1971, a new Virginia Constitution became effective. The 1971 Virginia Constitution contained Article VIII which was new. Unlike earlier constitutions, the 1971 Constitution was framed and proposed by the General Assembly instead of by convention and was approved by the voters in November, 1970. While the parties rely on the content of the cited constitutional provisions to support their respective positions, they go to some length in their briefs and in their arguments to discuss the legislative background on the obvious question, the meaning of the various constitutional provisions. To support their position, respondents cite the Report of the Commission on Constitutional Revision, an eleven person body appointed by Governor Godwin in 1969 to make recommendations to the Governor and the General Assembly on proposed constitutional provisions. Respondents also cite the debates in both houses of the General Assembly on what were then being considered as proposed constitutional provisions for consideration by the people of Virginia. Naturally, complainants have responded with their views of what the Commission recommended and thought about the topic of education

in its recommendations and what the General Assembly members thought about these provisions in their debates.

The Court considers that the first task in interpreting the meaning of the Virginia Constitution, as is the case in statutory construction generally, is to determine the plain meaning of the words used in relevant provisions. "Courts follow the rule that, if a constitutional provision is free of ambiguity, construction is impermissible and resort to legislative history or other extrinsic evidence is not allowed." *Thomson v. Robb*, 229 Va. 233, 239 (1985); *Cross v. City of Newport News*, 217 Va. 202, 204 (1976); *Portsmouth v. Chesapeake*, 205 Va. 259, 269 (1964); *Commonwealth v. Gregory*, 193 Va. 721, 726 (1952); *Edwards v. Commonwealth*, 191 Va. 272, 276 (1950). Since complainants rely on the two constitutional articles mentioned above, it is appropriate to examine them from the "plain meaning" perspective.

With respect to Article I, Section 15, the words "effective system of education" are urged by the complainants to necessarily mean substantial equality among school divisions in Virginia. The title of this Article is "Qualities necessary to preservation of free government." This indicates more of a general statement of objectives rather than an affirmative, enforceable duty. Along these same lines, the language used that "the Commonwealth *should* avail itself . . . by assuring the opportunity . . . by an effective system of education," with the use of the word "should," suggests things traditionally aspirational as opposed to the word "shall" which is not used and which is traditionally mandatory. Even if this language in Article I, Section 15, does mandate an effective system, to determine whether substantial equality must be reached to be "effective," this provision must be read in conjunction with another provision on education contained in Article VIII, Section 1, quoted above.

The words in Article VIII, Section 1, that refer to a "*system* of free public and elementary and secondary schools for all children of school age *throughout the Commonwealth* (emphasis supplied) are urged by the complainant to imply a unitary, equal system. However, "throughout the Commonwealth" does not modify "system," and therefore, no requirement of equality can be read into that particular clause. Rather, reading the language plainly, "throughout the Commonwealth" modifies "children of school age," meaning only that education be made available to all children in Virginia. That section does require "an educational program of *high quality*," (emphasis

supplied) and section 2 requires the General Assembly to develop the scheme to fund such a program. But nowhere does the language "high quality" indicate equality among all districts. In fact, the plain language makes it clear that the only funds which must be provided are those necessary to cover the "cost of maintaining an educational program *meeting the prescribed standards of quality.*" Va. Constitution, Art. VIII, § 2 (emphasis supplied). These standards, "determined and prescribed . . . by the Board of Education, subject to revision only by the General Assembly," *id.*, are the Constitution's own indication of what constitutes "high quality," and the level of educational opportunity for which funds are constitutionally guaranteed. The Virginia Constitution, while establishing education as a fundamental right, does not as written make equalized funding on the part of the Commonwealth a constitutional right.

Given that education is a fundamental right, there is the question of whether Virginia's statutory school funding scheme should pass muster under a strict scrutiny test, to determine if the right to education is actually being afforded or is substantively diminished so as to make it practically unavailable. The complainants have not alleged a violation of equal protection under the federal Constitution. The court is not aware of any authority, and has been cited to none, that would require a strict scrutiny test to apply to the state constitutional deprivation complained of here. There are other provisions in the Virginia Constitution that speak directly to the object for and administration of school funding. These other constitutional requirements which define educational objectives in Virginia negate a requirement for substantial equality in school funding. Moreover, the complainants have not even alleged that they are being deprived of even a minimal education.

In *Rose v. Council For Better Education, Inc.,* 790 S.W.2d 186, 189 (1989), the Supreme Court of Kentucky, in a school financing case with similar issues as are presented here, identified the question as "whether the Kentucky General Assembly has complied with its constitutional mandate 'to provide an efficient system of common schools through the state'." The Kentucky Court found "[i]n a word, the present system of common schools in Kentucky is not an 'efficient' one" and found the Kentucky method of financing "constitutionally deficient." *Id.* Unlike the case at bar, the plaintiffs in *Rose* brought their action contending that the Kentucky methods of school financing offended both the state constitution and the due process

and equal protection clauses of the Federal Constitution as well. But more importantly, the *Rose* plaintiffs alleged that Kentucky public school students were receiving an *inadequate* education, one that did not even meet minimal standards. In interpreting what the court viewed as a constitutional mandate of an "efficient" system of schools under the Kentucky Constitution, the court found, as this Court is urged to find, that the Kentucky Constitution required substantial uniformity and equality. However, in defining that equality the *Rose* court found that "the children of the poor and the children of the rich, the children who live in the poor district, and the children who live in the rich districts must be given the same opportunity and access to an adequate education." *Id.* at 211.

Thus, the mandate in Rose brought about by the issue framed by the plaintiffs there was for "equal opportunity for children to have an adequate education." The Rose court went on to refer, a number of times, to the "minimum" quality of education which the General Assembly had to provide, even noting that localities were free to pursue higher goals. *Id.* at 212.

Here the complainants do not allege that the present funding system has failed to reach the Standards of Quality. There has been no argument that the Standards of Quality are not being met by any of the complainant school districts. Most of what is alleged as specific inequities (disparities among the districts in instructional personnel/ student ratios, instructional programs, books, facilities, etc.) are explicitly addressed in the Standards of Accreditation, promulgated by the Board of Education as a corollary to the Standards of Quality. Likewise, the complainants have not alleged that the localities are not able to meet the Standards of Accreditation. Further, and perhaps most importantly, they do not allege that the Standards of Quality or Accreditation are inadequate to ensure the "high quality" education mandated by the Virginia Constitution.

The mandate for public education funding in the Virginia Constitution, by its terms, guarantees only that the Standards of Quality be met. Reading into that a requirement of equality among all districts would be to rewrite the Standards of Quality. If the complainants wish to argue that to achieve "high quality," or a "minimum" quality of education, the Standards of Quality should prescribe programs substantially equal among the districts, that argument can be made to the General Assembly. Rather, the Virginia constitutional mandate for educational funding guarantees constitutional protection for a

minimum as shown in the Standards of Quality, below which no school system should go.

For the foregoing reasons, the Court finds that the Virginia Constitution does not now mandate quality of funding for school districts in Virginia, except for meeting minimum educational standards. Accordingly, the respondents' Demurrer is sustained. Given this action, it is not necessary to now decide the other questions raised by the respondents in their Demurrer. Complainants may stand on the allegations as made, or they may file an amended Bill of Complaint. Should they choose to amend, they are granted leave to file such within twenty days, and the respondents shall file any further responsive pleadings within ten days of receipt of any amended pleading.