# REID SCOTT, ET AL.

### V.

# COMMONWEALTH OF VIRGINIA, ET AL.

Record No. 930473

April 15, 1994

Present: Carrico, C.J., Compton, Stephenson, Whiting, Hassell, and Keenan, JJ., and Poff, Senior Justice

*Andrew P. Miller (Margaret Feinstein; Dickstein, Shapiro & Morin, on briefs), for appellants.*

*Paul J. Forch, Senior Assistant Attorney General (Stephen D. Rosenthal, Attorney General; R. Claire Guthrie, Chief Deputy Attorney General; Jessica S. Jones, Acting Deputy Attorney General; Joan W. Murphy, Assistant Attorney General, on brief), for appellees.*

JUSTICE STEPHENSON delivered the opinion of the Court.

The dispositive question in this appeal is whether the current system of funding the Commonwealth's public elementary and secondary schools violates Article I, § 15 and Article VIII, § 1 of the Constitution of Virginia.

## I

Eleven public school students[1] and seven local school boards[2] (collectively, the Students) filed a bill of complaint seeking a declaratory judgment that the current system of funding public elementary and secondary schools violates the Virginia Constitution by denying the student complainants and other children "an educational opportunity substantially equal to that of children who attend public school in wealthier divisions." The defendants[3] (collectively, the Commonwealth) filed a demurrer to the bill of complaint on the ground, *inter alia,* that "[s]ubstantially equal spending and instructional resources in each of the . . . school divisions . . . is *not* mandated by Virginia's Constitution."

The trial court sustained the demurrer. In so ruling, the trial court concluded, *inter alia,* that "the Virginia Constitution does not now mandate equality of funding for school districts in Virginia, except for meeting minimum educational standards." The trial court gave the Students the option of filing an amended bill of complaint. The Students, however, elected to stand on their original bill, and the trial court entered a final judgment of dismissal. We awarded the Students an appeal from the trial court's judgment.

## II

The facts we consider are those alleged in the bill of complaint. The two major components of the funding system for the Commonwealth's public elementary and secondary schools are (1) state and local funds mandated by the state aid system, and (2) local funds that are not mandated by the Commonwealth.[4] The state and local funds mandated by the state aid system consist primarily of the instructional and support costs required by the standards of quality, which are the minimum state-wide educational standards every local school division must meet. Code §§ 22.1-253.13:1 to -253.13:8. The

---

[1] The students, infants who sued by their next friends, are: Reid Scott, Morgan Scott, Erin Scott, Justin Carr, Bradley Talley, Kathryn Talley, Joseph Davis, Milton Richardson, Jr., Mary Wright, Amy Wright, and Scott Raab.

[2] The local school boards are: Buchanan County School Board, Halifax County School Board, Pulaski County School Board, Russell County School Board, Petersburg City School Board, Radford City School Board, and South Boston City School Board.

[3] The defendants are: Commonwealth of Virginia; Board of Education of the Commonwealth of Virginia; James W. Dyke, Jr., then Secretary of Education for the Commonwealth; and Joseph A. Spagnolo, Jr., then Superintendent of Public Instruction for the Commonwealth.

[4] Additionally, federal funds make up approximately five percent of a school division's budget.

Board of Education determines and prescribes the standards of quality, subject to revision by the General Assembly. Va. Const. art. VIII, § 2.

For the latest school year that data is available,[5] total per pupil funding for general education in the Commonwealth's school divisions ranged from $2,895 to $7,268. Thus, the Commonwealth and its subdivisions spent 2.5 times more money per child on some of its school children than on other school children.

School divisions with low fiscal capacities paid teachers, on average, much lower salaries than divisions with high fiscal capacities. The average salaries for classroom teachers were 39% higher in certain localities than in others and ranged from $27,471 in the ten poorest school divisions to $38,095 in the ten wealthiest school divisions.

There was also a great disparity in instructional personnel/pupil ratio between the ten wealthiest and the ten poorest school divisions. The ten wealthiest divisions had an average instructional personnel/pupil ratio of 81.8/1,000, and the ten poorest divisions had an average instructional personnel/pupil ratio of 66.2/1,000. Thus, the wealthiest divisions had an average ratio 24% higher than that in the poorest divisions.

Spending for instructional materials was nearly 12 times greater in certain school divisions than in others and ranged from $17.52 per pupil to almost $208 per pupil. Spending for library books and supplies was more than 22 times greater in certain divisions than in others and ranged from $2.22 per pupil to almost $50 per pupil.

The disparity in State and local funding between the highest-funded and the lowest-funded school divisions continues to increase. Indeed, the disparity has increased from $3,844 per pupil to $4,372 per pupil between the 1987-88 and the 1989-90 school years, an increase of approximately 14%.

Furthermore, school divisions with high fiscal capacities have instructional programs with greater breadth and depth in, among other areas, mathematics, science, social studies, languages, art, and music. Public high schools in divisions with low fiscal capacities have fewer course electives, fewer advanced placement courses, fewer foreign language courses, and a more narrow range of science and mathematics offerings.

### III

In the prayer of their bill of complaint, the Students requested, *inter alia,* that the trial court enter a judgment declaring:

---

[5] The 1989-90 school year.

(i) that the current system of funding public elementary and secondary schools within the Commonwealth of Virginia violates Article VIII, § 1 of the Constitution of Virginia; and

(ii) that the current system of funding public elementary and secondary schools within the Commonwealth of Virginia violates Article I, § 15, paragraph 2 of the Constitution of Virginia.

The trial court, in its memorandum opinion, concluded that, although public education is a "fundamental right," the Constitution "does not . . . make equalized funding [by] the Commonwealth a constitutional right." Instead, the Constitution "guarantees only that the Standards of Quality be met." The trial court noted that the Students "do not allege that the present funding system has failed to reach the Standards of Quality."

## IV

### A

The Students contend that education is a fundamental right guaranteed by the Constitution and, therefore, that the Commonwealth's statutory funding scheme is subject to strict judicial scrutiny. They point out that Article I, § 15 of the Constitution speaks of "an effective system of education throughout the Commonwealth" and Article VIII, § 1 prescribes "a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth." The term "system," they assert, means an arrangement of things so related or connected as to form a unity, and the facts, they allege, demonstrate that the schools throughout the Commonwealth do not constitute an "effective system" because of the great disparity between the wealthiest and the poorest school divisions.

The Students further argue that the current formula for funding the standards of quality violates their fundamental right to education. They assert that, unless the formula is changed to eliminate the substantial disparity between the school divisions, the Commonwealth "will never have an 'effective' system of education."

The Commonwealth contends, on the other hand, that, although the framers of the Constitution "recogniz[ed] the importance of education by devoting an entire article to it," nowhere in Article VIII "is there *any* expressed mandate for 'substantial equality' in spending or pro-

grams among or within school divisions." According to the Commonwealth, Article VIII, § 2 of the Constitution only requires that "[s]tandards of quality for the several school divisions shall be determined and prescribed from time to time by the Board of Education, subject to revision only by the General Assembly." The Commonwealth notes, as did the trial court, that the Students do not claim that they are being denied an educational program that meets the prescribed standards of quality.

## B

When constitutional language is clear and unambiguous, a court must give the language its plain meaning and is not allowed to resort to legislative history or other extrinsic evidence. *Thomson* v. *Robb,* 229 Va. 233, 239, 328 S.E.2d 136, 139 (1985); *Harrison* v. *Day,* 200 Va. 439, 448, 106 S.E.2d 636, 644 (1959). In the present case, we think the language in the constitutional provisions under consideration is clear and unambiguous. Therefore, we will give the language its plain meaning and not resort to extrinsic evidence.

## 1

Article VIII, the "Education Article," sets forth the constitutional framework for the Commonwealth's public school system. The article contains eleven sections, but those most pertinent in the present case are §§ 1 and 2, which read as follows:

**§ 1. Public schools of high quality to be maintained.**—The General Assembly shall provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth, and shall seek to ensure that an educational program of high quality is established and continually maintained.

**§ 2. Standards of quality; State and local support of public schools.**—Standards of quality for the several school divisions shall be determined and prescribed from time to time by the Board of Education, subject to revision only by the General Assembly.

The General Assembly shall determine the manner in which funds are to be provided for the cost of maintaining an educational program meeting the prescribed standards of quality, and

shall provide for the apportionment of the cost of such program between the Commonwealth and the local units of government comprising such school divisions. Each unit of local government shall provide its portion of such cost by local taxes or from other available funds.

 Section 1 speaks in both mandatory and advisory language. The first clause is mandatory and imposes upon the General Assembly a constitutional duty to create and maintain a system of schools throughout the Commonwealth. The language in the second clause is merely aspirational, stating a goal that the General Assembly is admonished and encouraged to attain.

Section 2 addresses the two essential elements of quality education: standards and funding. By the terms of § 2, the General Assembly is empowered to make the final decision about both standards of quality and funding.

██ Clearly, nowhere in Article VIII, §§ 1 and 2 is there any requirement for "substantial equality" in spending or programs among or within the school divisions in the Commonwealth. Instead, the provisions of Article VIII plainly mandate that each school division provide an educational program meeting standards of quality as determined and prescribed by the General Assembly.

2

The only other reference to education in the Constitution is found in Article I, § 15, a part of the Bill of Rights, which reads as follows:

**§ 15. Qualities necessary to preservation of free government.**—That no free government, nor the blessings of liberty, can be preserved to any people, but by a firm adherence to justice, moderation, temperance, frugality, and virtue; by frequent recurrence to fundamental principles; and by the recognition by all citizens that they have duties as well as rights, and that such rights cannot be enjoyed save in a society where law is respected and due process is observed.

That free government rests, as does all progress, upon the broadest possible diffusion of knowledge, and that the Commonwealth should avail itself of those talents which nature has sown so liberally among its people by assuring the opportu-

nity for their fullest development by an effective system of education throughout the Commonwealth.

■ Section 15 of Article I also is clear and unambiguous. The second paragraph of § 15 recognizes that "free government rests . . . upon the broadest possible diffusion of knowledge." It also admonishes that the Commonwealth "*should* avail itself" of its peoples' talents "by assuring the opportunity for [the peoples'] fullest development by an effective system of education throughout the Commonwealth." (Emphasis added.) While § 15 of Article I clearly emphasizes the importance of education generally, its language also is aspirational and not mandatory. Section 15 does not impose a mandate upon the General Assembly with respect to a system of free public schools. Unquestionably, the language in § 15 cannot be read to impose a requirement of uniformity in spending and programs among and within the Commonwealth's school divisions.

## V

■ In sum, we agree with the trial court that education is a fundamental right under the Constitution. Even applying a strict scrutiny test, as urged by the Students, however, we hold that nowhere does the Constitution require equal, or substantially equal, funding or programs among and within the Commonwealth's school divisions.

■ The Constitution does mandate that the General Assembly provide for a system of free public schools throughout the Commonwealth, and the General Assembly has provided for such a system. Code § 22.1-2. The Constitution also accords the General Assembly the ultimate authority for determining and prescribing the standards of quality for the school divisions, which authority the General Assembly has discharged. Code §§ 22.1-253.13:1 to -253.13:8. Finally, the Constitution requires the General Assembly to determine the manner of funding to provide the cost of maintaining an educational program that meets the prescribed standards of quality and how the cost shall be apportioned between the Commonwealth and the localities. The General Assembly has enacted legislation carrying out these requirements, Code §§ 22.1-88, -94, and -95, and the Students do not contend that the manner of funding prevents their schools from meeting the standards of quality.

■ Therefore, while the elimination of substantial disparity between school divisions may be a worthy goal, it simply is not

required by the Constitution. Consequently, any relief to which the Students may be entitled must come from the General Assembly.

Accordingly, we will affirm the trial court's judgment.

*Affirmed.*