RYAN MONTOY, *et al.*, *Appellees/Cross-appellants*, v. STATE OF KANSAS, *et al.*, *Appellants/Cross-appellees.*

(120 P.3d 306)

Opinion filed January 3, 2005.

*Curtis L. Tideman*, of Lathrop & Gage L.C., of Overland Park, argued the cause, and *Kenneth L. Weltz* and *Alok Ahuja*, of the same firm, and *David W. Davies*, assistant attorney general, and *Phill Kline*, attorney general, were with him on the briefs for appellant/cross-appellee State of Kansas.

*Dan Biles*, of Gates, Biles, Shields & Ryan, P.A., of Overland Park, argued the cause, and *Rodney J. Bieker*, of Kansas Department of Education, and *Cheryl Lynne Whelan*, of Lawrence, were with him on the briefs for appellants/cross-appellees Janet Waugh, Sue Gamble, John Bacon, Bill Wagnon, Connie Morris, Bruce Wyatt, Kenneth Willard, Carol Rupe, Iris Van Meter, Steve Abrams, and Andy Tompkins.

*Alan L. Rupe*, of Kutak Rock LLP, of Wichita, argued the cause, and *Richard A. Olmstead*, of the same firm, and *John S. Robb*, of Somers Robb & Robb, of Newton, were with him on the briefs for appellees/cross-appellants.

*Wm. Scott Hesse*, assistant attorney general, was on the brief for defendants/cross-appellees Governor Kathleen Sebelius and State Treasurer Lynn Jenkins.

*Jane L. Williams*, of Seigfreid, Bingham, Levy, Selzer & Gee, of Kansas City, Missouri, was on the brief for *amicus curiae* Kansas Families United for Public Education.

*Patricia E. Baker*, of Kansas Association of School Boards, of Topeka, was on the brief for *amicus curiae* Kansas Association of School Boards.

*David M. Schauner* and *Robert Blaufuss*, of Kansas National Education Association, of Topeka, were on the brief for *amicus curiae* Kansas National Education Association.

*Joseph W. Zima*, of Topeka Public Schools, was on the brief for *amicus curiae* Unified School District No. 501, Shawnee County, Kansas.

*Michael G. Norris* and *Melissa D. Hillman*, of Norris, Keplinger & Hillman, L.L.C., of Overland Park, were on the brief for *amici curiae* Unified School Districts Nos. 233, 229, and 232, Johnson County, Kansas.

*Anne M. Kindling*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, was on the brief for *amicus curiae* Unified School District No. 512, Shawnee Mission, Kansas.

*Bernard T. Giefer*, of Giefer Law LLC, of WaKeeney, was on the brief for *amici curiae* Unified School District No. 208, Trego County, Kansas (WaKeeney), *et al.* (60 other Kansas school districts).

*Thomas R. Powell* and *Roger M. Theis*, of Hinkle Elkouri Law Firm L.L.C., of Wichita, were on the brief for *amicus curiae* Unified School District No. 259, Sedgwick County, Kansas.

*Janice L. Mathis*, of Rainbow/PUSH Coalition, of Atlanta, Georgia, was on the brief for *amicus curiae* Rainbow/PUSH Coalition.

*Cynthia J. Sheppeard*, of Weathers & Riley, of Topeka, was on the brief for *amicus curiae* Kansas Action for Children.

*Bob L. Corkins*, of Lawrence, was on the brief for *amicus curiae* Kansas Taxpayers Network.

*Kirk W. Lowry*, of Kansas Advocacy & Protective Services, of Topeka, was on the brief for *amicus curiae* Kansas Advocacy & Protective Services.

*Per Curiam*: The defendants in this case, the State of Kansas (appellant/cross-appellee) along with Janet Waugh, Sue Gamble, John Bacon, Bill Wagnon, Connie Morris, Bruce Wyatt, Kenneth Willard, Carol Rupe, Iris Van Meter, Steve Abrams and Andy Tompkins (the State Board of Education related defendants) (appellants/cross-appellees) appeal from a decision of the district court holding that the Kansas School District Finance and Quality Performance Act (SDFQPA), K.S.A. 72-6405 *et seq.*, is unconstitutional.

The plaintiffs in this case, U.S.D. No. 305 (Salina) and U.S.D. No. 443 (Dodge City), along with 36 individually named students in those districts, cross-appeal from the district court's determination that the legislature did not abrogate the constitutional obligations of the State Board of Education.

The constitutionality of the statutory scheme for funding the public schools in Kansas is at issue in this appeal. Because this court's resolution of this issue will have statewide effect and require

legislative action in the 2005 legislative session, we announce our decision in this brief opinion. A formal opinion will be filed at a later date.

After examining the record and giving full and complete consideration to the arguments raised in this appeal, we resolve the issue as follows:

1. We reverse the district court's holding that SDFQPA's financing formula is a violation of equal protection. Although the district court correctly determined that the rational basis test was the proper level of scrutiny, it misapplied that test. We conclude that all of the funding differentials as provided by the SDFQPA are rationally related to a legitimate legislative purpose. Thus, the SDFQPA does not violate the Equal Protection Clause of the Kansas or United States Constitutions.

2. We also reverse the district court's holding that the SDFQPA financing formula has an unconstitutional disparate impact on minorities and/or other classes. In order to establish an equal protection violation on this basis, one must show not only that there is a disparate impact, but also that the impact can be traced to a discriminatory purpose. *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 272, 60 L. Ed. 2d 870, 99 S. Ct. 2282 (1979). No discriminatory purpose was shown by the plaintiffs. Thus, the SDFQPA is not unconstitutional based solely on its "disparate impact."

3. We affirm the district court's holding that the legislature has failed to meet its burden as imposed by Art. 6, § 6 of the Kansas Constitution to "make suitable provision for finance" of the public schools.

The district court reached this conclusion after an 8-day bench trial which resulted in a record of approximately 1,400 pages of transcript and 9,600 pages of exhibits. Most of the witnesses were experts in the fields of primary and secondary education. The trial followed this court's decision in *Montoy v. State*, 275 Kan. 145, 152-53, 62 P.3d 228 (2003) (*Montoy I*), in which we held, in part, that the issue of suitability was not resolved by *U.S.D. No. 229 v. State*, 256 Kan. 232, 885 P.2d 1170 (1994), *cert. denied* 515 U.S. 1144 (1995). We had held in *U.S.D. No. 229* that the SDFQPA *as*

*originally adopted in 1992* made suitable provision for the finance of public education. See 256 Kan. at 254-59. Later, in *Montoy I*, we noted that the issue of suitability is not stagnant but requires constant monitoring. See 275 Kan. at 153.

Following the trial, the district court made findings regarding the various statutory and societal changes which occurred after the decision in *U.S.D. No. 229* and affected school funding. Regarding societal changes, the district court found: (1) 36% of Kansas public school students now qualify for free or reduced-price lunches; (2) the number of students with limited proficiency in English has increased dramatically; (3) the number of immigrants has increased dramatically; and (4) state institutions of higher learning now use more rigorous admission standards.

Additionally, the district court found a number of statutory changes made after the decision in *U.S.D. No. 229* which affected the way the financing formula delivers funds: (1) the goals set out in K.S.A. 72-6439(a) were removed; (2) the SDFQPA's provision requiring an oversight committee to ensure fair and equitable funding was allowed to expire; (3) the low enrollment weighting was changed; (4) correlation weighting was added; (5) at-risk pupil weighting was changed; (6) the mill levy was decreased from 35 mills to 20 mills; (7) a $20,000 exemption for residential property was added to the mill levy, also decreasing revenue; (8) a new facilities weighting was added; (9) special education funds were added to the calculation to increase the base on which the local option budget funding was calculated; (10) ancillary weighting was added; (11) the cap on capital outlay authority was removed; and (12) most special education funds were limited to reimbursement for 85 percent of the costs incurred in hiring special education teachers and paraprofessionals.

Our standard of review requires us to determine whether the district court made findings of fact which are supported by substantial competent evidence and are sufficient to support the conclusions of law. *McCain Foods USA, Inc. v. Central Processors, Inc.*, 275 Kan. 1, 12, 61 P.3d 68 (2002). We conclude that the district court's findings regarding the societal and legislative changes are supported by substantial competent evidence.

The plaintiffs argued and the district court found that the cumulative result of these changes is a financing formula which does not make suitable provision for finance of public schools, leaving them inadequately funded. Before determining whether there is substantial competent evidence to support these findings, we must examine the standard for determining whether the current version of the SDFQPA makes suitable provision for the finance of public school education. The concept of "suitable provision for finance" encompasses many aspects. First and perhaps foremost it must reflect a level of funding which meets the constitutional requirement that "[t]he legislature shall provide for intellectual, educational, vocational and scientific *improvement* by establishing and maintaining public schools . . . ." (Emphasis added.) Kan. Const. art. 6, § 1. The Kansas Constitution thus imposes a mandate that our educational system cannot be static or regressive but must be one which "advance[s] to a better quality or state." See Webster's II New College Dictionary 557 (1999) (defining "improve"). In apparent recognition of this concept, the legislature incorporated performance levels and standards into the SDFQPA and, although repealing the 10 goals which served as the foundation for measuring suitability in the *U.S.D. No. 229* decision, has retained a provision which requires the State Board of Education to design and adopt a school performance accreditation system "based upon improvement in performance that reflects high academic standards and is measurable." K.S.A. 72-6439(a). Moreover, the legislature mandated standards for individual and school performance levels "the achievement of which represents excellence in the academic area at the grade level to which the assessment applies." K.S.A. 72-6439(c).

Through these provisions, the legislature has imposed criteria for determining whether it has made suitable provision for the finance of education: Do the schools meet the accreditation requirements and are students achieving an "improvement in performance that reflects high academic standards and is measurable"? K.S.A. 72-6439(a).

These student performance accreditation measures were utilized in 2001 when the legislature directed that a professional evaluation

be performed to determine the costs of a suitable education for Kansas school children. In authorizing the study, the legislature defined "suitable education." K.S.A. 2003 Supp. 46-1225(e). The Legislative Education Planning Committee (LEPC), to whom the task of overseeing the study was delegated, determined which performance measures would be utilized in determining if Kansas' school children were receiving a suitable education. The evaluation, performed by Augenblick & Myers, utilized the criteria established by the LEPC, and, in part, examined whether the current financing formula and funding levels were adequate for schools to meet accreditation standards and performance criteria. The study concluded that both the formula and funding levels were inadequate to provide what the legislature had defined as a suitable education.

Although in *Montoy I*, 275 Kan. at 153-55, we concluded that accreditation standards may not always adequately define a suitable education, our examination of the extensive record in this case leads us to conclude that we need look no further than the legislature's own definition of suitable education to determine that the standard is not being met under the current financing formula. Within that record there is substantial competent evidence, including the Augenblick & Myers study, establishing that a suitable education, as that term is defined by the legislature, is not being provided. In particular, the plaintiff school districts (Salina and Dodge City) established that the SDFQPA fails to provide adequate funding for a suitable education for students of their and other similarly situated districts, *i.e.*, middle-and large-sized districts with a high proportion of minority and/or at-risk and special education students. Additional evidence of the inadequacy of the funding is found in the fact that, while the original intent of the provision for local option budgets within the financing formula was to fund "extra" expenses, some school districts have been forced to use local option budgets to finance general education.

Furthermore, in determining if the legislature has made suitable provision for the finance of public education, there are other factors to be considered in addition to whether students are provided a suitable education. Specifically, the district court found that the

financing formula was not based upon actual costs to educate children but was instead based on former spending levels and political compromise. This failure to do any cost analysis distorted the low enrollment, special education, vocational, bilingual education, and the at-risk student weighting factors.

Thus, there is substantial competent evidence to support the district court's findings discussed above. These findings are sufficient to support the conclusion that the legislature has failed to "make suitable provision for finance" of the public school system as required by Art. 6, § 6 of the Kansas Constitution.

4. As to the cross-appeal, we affirm the district court's holding that the legislature has not usurped the powers of the State Board of Education.

In addressing the appropriate remedy, as the district court noted, there are "literally hundreds of ways" the financing formula can be altered to comply with Art. 6, § 6. Similarly, there are many ways to re-create or reestablish a suitable financing formula. We do not dictate the precise way in which the legislature must fulfill its constitutional duty. That is for the legislators to decide, consistent with the Kansas Constitution.

It is clear increased funding will be required; however, increased funding may not in and of itself make the financing formula constitutionally suitable. The equity with which the funds are distributed and the actual costs of education, including appropriate levels of administrative costs, are critical factors for the legislature to consider in achieving a suitable formula for financing education. By contrast, the present financing formula increases disparities in funding, not based on a cost analysis, but rather on political and other factors not relevant to education.

We are aware that our decision (1) raises questions about continuing the present financing formula pending corrective action by the legislature; (2) could have the potential to disrupt the public schools; and (3) requires the legislature to act expeditiously to provide constitutionally suitable financing for the public school system. Accordingly, at this time we do not remand this case to the district court or consider a final remedy, but instead we will retain jurisdiction and stay all further proceedings to allow the legislature a

reasonable time to correct the constitutional infirmity in the present financing formula. In the meantime, the present financing formula and funding will remain in effect until further order of this court.

We have in this brief opinion endeavored to identify problem areas in the present formula as well as legislative changes in the immediate past that have contributed to the present funding deficiencies. We have done so in order that the legislature take steps it deems necessary to fulfill its constitutional responsibility. Its failure to act in the face of this opinion would require this court to direct action to be taken to carry out that responsibility. We believe further court action at this time would not be in the best interests of the school children of this state.

The legislature, by its action or lack thereof in the 2005 session, will dictate what form our final remedy, if necessary, will take. To ensure the legislature complies with our holding, we will withhold our formal opinion until corrective legislation has been enacted or April 12, 2005, whichever occurs first, and stay the issuance of our mandate in this case▪

Affirmed in part and reversed in part.

BEIER, J., concurring: I concur fully in the court's result and in the bulk of its rationale. I write separately only because I disagree with the holding of *U.S.D. No. 229 v. State*, 256 Kan. 232, 260-63, 885 P.2d 1170 (1994), that education is not a fundamental right under the Kansas Constitution. I believe it is. Thus I would not, as the court implicitly did on its way to the opinion in this case, rely on *U.S.D. No. 229* to conclude that the Kansas school financing formula under SDFQAA did not violate the Equal Protection Clauses of the federal and state Constitutions. Rather, I would take the opportunity presented by this case to overrule the *U.S.D. No. 229* holding on the status of the right to education under the Kansas Constitution.

In *San Antonio School District v. Rodriguez*, 411 U.S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278, *reh. denied* 411 U.S. 959 (1973), the United States Supreme Court held that education is not a funda-

mental right under the United States Constitution. In reaching this conclusion, the Court stated:

"[T]he key to discovering whether education is 'fundamental' is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing. Nor is it to be found by weighing whether education is as important as the right to travel. Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution." 411 U.S. at 33-34.

Article 6, § 1 of our state constitution reads: "The legislature *shall* provide for intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools, educational institutions and related activities." (Emphasis added.) Article 6, § 6 provides: "The legislature *shall* make suitable provision for finance of the educational interests of the state." (Emphasis added.)

If we were to apply the United States Supreme Court's straightforward pattern of analysis from *Rodriguez*, we would need to look no further than the mandatory language of these two constitutional provisions. Because they explicitly provide for education, education is a fundamental right.

It is certainly true, however, that our sister states, when faced with the question of whether their own constitutions make education a fundamental right, have not always been satisfied with the *Rodriguez* approach. For example, in *Lujan v. Colorado State Bd. of Educ.*, 649 P.2d 1005, 1017 (Colo. 1982), the Colorado Supreme Court stated:

"While the [*Rodriguez*] test may be applicable in determining fundamental rights under the United States Constitution, it has no applicability in determining fundamental rights under the Colorado Constitution. This is so because of the basic and inherently different natures of the two constitutions . . . . [Footnote omitted.]

"The United States Constitution is one of restricted authority and delegated powers. As provided in the Tenth Amendment, all powers not granted to the United States by the Constitution, nor denied to the States by it, are reserved to the States or to the People. [Citations omitted.]

"Conversely, the Colorado Constitution is not one of limited powers where the state's authority is restricted to the four corners of the document. [Citation omitted.] The Colorado Constitution does not restrict itself to addressing only those areas deemed fundamental. Rather, it contains provisions which are . . . suited

for statutory enactment . . . as well as those deemed fundamental to our concept of ordered liberty . . . . Thus, under the Colorado Constitution, fundamental rights are not necessarily determined by whether they are guaranteed explicitly or implicitly within the document."

Several other states also have rejected *Rodriguez* as the test for whether their state constitutional provisions on education demand recognition of a fundamental right. See *Serrano v. Priest* (*Serrano II*), 18 Cal. 3d 728, 766-67, 135 Cal. Rptr. 345, 557 P.2d 929 (1976) (refusing to be constrained by whether rights and interests are explicitly or implicitly guaranteed by state constitution), *cert. denied* 432 U.S. 907 (1977); *McDaniel v. Thomas*, 248 Ga. 632, 646, 285 S.E.2d 156 (1981) ("explicit or implicit" guarantee model lacks meaningful limitation under state constitution); *Thompson v. Engelking*, 96 Idaho 793, 803-05, 537 P.2d 635 (1975) (rejecting categorization of "fundamental" versus "non-fundamental" rights); *Hornbeck v. Somerset Co. Bd. of Educ.*, 295 Md. 597, 650, 458 A.2d 758 (1983) (state constitution explicitly guarantees rights and interests not considered "fundamental"); *Bd. of Edn. v. Walter*, 58 Ohio St. 2d 368, 375, 390 N.E.2d 813 (1979) (state constitution not limited in power and contains provisions suitable for statutory enactment), *cert. denied* 444 U.S. 1015 (1980); *Fair Sch. Finance Coun. v. State of Okla.*, 746 P.2d 1135, 1149 (Okla. 1987) (fundamental rights not necessarily determined by inclusion in state constitution); *Olsen ex rel. Johnson v. State*, 276 Or. 9, 19-20, 554 P.2d 139 (1976) (laws considered to be legislation included in state constitution; thus *Rodriguez*' method weak); see also Dayton, *Serrano and its Progeny: An Analysis of 30 Years of School Funding Litigation*, 157 Ed. Law. Rep. 447, 453 (2001) (most states reject *Rodriguez* test to determine existence of state constitutional right to education). In such states, *Rodriguez*' simple search for explicit or implicit recognition of a fundamental right to education in a constitution's language gives way to a variety of other patterns of analysis. For example, certain interests are deemed fundamental in California "because of their impact on those individual rights and liberties which lie at the core of our free and representative form of government." *Serrano II*, 18 Cal. 3d at 767-68.

At this point in time, courts in 15 states—Alabama, California, Connecticut, Kentucky, Minnesota, New Hampshire, New Jersey, North Carolina, North Dakota, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming—appear to have recognized a fundamental right to education under their constitutions, employing various patterns of analysis. See *Opinion of the Justices*, 624 So. 2d 107, 157 (Ala. 1993) (advisory opinion) ("[T]he right to education in Alabama is fundamental" and implicitly guaranteed by the state constitution); *Serrano v. Priest (Serrano I)*, 5 Cal. 3d 584, 608-09, 96 Cal. Rptr. 601, 487 P.2d 1241 (1971) ("[T]he distinctive and priceless function of education in our society warrants, indeed compels, our treating it as a 'fundamental interest.' "); *Horton v. Meskill (Horton I)*, 172 Conn. 615, 646, 376 A.2d 359 (1977) (state constitution specifically recognizes right to education; this right is "basic and fundamental"); *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 206 (Ky. 1989) (framers of state constitution emphasized education as essential to welfare of citizens of Kentucky); *Skeen v. State*, 505 N.W.2d 299, 313 (Minn. 1993) ("[W]e hold that education *is* a fundamental right under the state constitution, not only because of its overall importance to the state but also because of the explicit language used to describe this constitutional mandate."); *Claremont School Dist. v. Governor*, 142 N.H. 462, 473, 703 A.2d 1353 (1997) ("[E]ven a minimalist view of educational adequacy recognizes the role of education in preparing citizens to participate in the exercise of voting and first amendment rights. The latter being recognized as fundamental, it is illogical to place the means to exercise those rights on less substantial constitutional footing than the rights themselves."); *Robinson v. Cahill*, 69 N.J. 133, 147, 351 A.2d 713 (1975) ("[T]he right of children to a thorough and efficient system of education is a fundamental right."), *cert. denied sub nom. Klein v. Robinson*, 423 U.S. 913 (1975); *Leandro v. State of North Carolina*, 346 N.C. 336, 348, 488 S.E.2d 249 (1997) ("[T]he intent of the framers [of the state constitution] was that every child have a fundamental right to a sound basic education which would prepare the child to participate fully in society as it existed in his or her lifetime."); *Bismarck Public School Dist. 1 v. State*, 511 N.W.2d 247, 256 (N.D. 1994) ("The

parties agree that the right to education is a fundamental right under the North Dakota Constitution."); *Brigham v. State*, 166 Vt. 246, 262, 692 A.2d 384 (1997) (emphasizing importance of education to self-government and state's duty to ensure proper dispersion); *Scott v. Commonwealth*, 247 Va. 379, 386, 443 S.E.2d 138 (1994) (finding state constitution's language clear and unambiguous; state should assure opportunity for fullest development through education); *Seattle School Dist. v. State*, 90 Wash. 2d 476, 511, 585 P.2d 71 (1978) ("The [state constitution's] singular use of the term 'paramount duty,' when taken together with its plain English meaning, is [a] clear indication of the constitutional importance attached to the public education of the State's children."); *Pauley v. Kelly*, 162 W. Va. 672, 707, 255 S.E.2d 859 (1979) (finding education is fundamental right under state constitution's mandatory requirement of "thorough and efficient system of free schools"); *Kukor v. Grover*, 148 Wis. 2d 469, 496, 436 N.W.2d 568 (1989) (" '[E]qual opportunity for education' is a fundamental right," as emphasized by Wisconsin's case law and legislature's involvement); *Washakie Co. Sch. Dist. No. One v. Herschler*, 606 P.2d 310, 333 (Wyo. 1980) ("In light of the emphasis which the Wyoming Constitution places on education, there is no room for any conclusion but that education for the children of Wyoming is a matter of fundamental interest."), *cert. denied* 449 U.S. 824 (1980).

Meanwhile, six states—Colorado, Georgia, Idaho, Maryland, New York, and Ohio—have rejected arguments that their state constitutions establish education as a fundamental right. See *Lujan*, 649 P.2d at 1017 (noting Colorado Constitution not restricted to areas deemed fundamental; on its face, does not establish education as fundamental right); *Levittown UFSD v. Nyquist*, 57 N.Y.2d 27, 43, 453 N.Y.S.2d 643, 439 N.E.2d 359 (1982) (The state constitution "does not automatically entitle [education] to classification as a 'fundamental constitutional right' triggering a higher standard of judicial review for purposes of equal protection analysis."); *Bd. of Edn.*, 58 Ohio St. 2d at 374 (rejecting the *Rodriguez* analysis which would have established education as a fundamental right under Ohio's constitution); *Hornbeck*, 295 Md. at 649 ("[E]ducation 'can be a major factor in an individual's chances for

economic and social success as well as a unique influence on a child's development as a good citizen and on his future participation in political and community life.' [Citation omitted.] Nevertheless, we conclude that education is not a fundamental right for purposes of equal protection analysis."); *McDaniel*, 248 Ga. at 647 (noting complexity of school financing and management, remaining consistent with *Rodriguez*, and holding education "per se" not fundamental right); *Thompson*, 96 Idaho at 805 (refusing to classify right to education as fundamental; holding schemes for school funding unconstitutional could negatively affect funding for other local services).

The exact nature of any right to education under the Oklahoma Constitution is currently unclear. See *Fair Sch. Finance Coun.*, 746 P.2d at 1149-50 (Okla. 1987) (Even "[a]ssuming that education is a fundamental interest, the question remains as to what is the exact nature of the interest guaranteed. . . . We find no authority to support the plaintiffs' contention that the school finance system should be subjected to strict judicial scrutiny."). The status of any right in Arizona also is unclear at this time. See *Shofstall v. Hollings*, 110 Ariz. 88, 90, 515 P.2d 590 (1973) ("We hold that the [state] constitution does establish education as a fundamental right of pupils between the ages six and twenty-one years."); but see *Roosevelt Elem. School Dist. No. 66 v. Bishop*, 179 Ariz. 233, 238, 877 P.2d 806 (1994) ("We do not understand how the rational basis test can be used when a fundamental right has been implicated. . . . If education is a fundamental right, the compelling state interest test [strict scrutiny] ought to apply. . . . [I]f the rational basis test properly applies, education is not a fundamental right.").

Those courts that recognize a fundamental right to education under their state constitutions also vary on the extent to which they permit the right's status to strengthen judicial review of specific legislative enactments. Some apply strict scrutiny when they review statutes on school funding. See, *e.g.*, *Serrano I*, 5 Cal. 3d 584 (state funding scheme invidiously discriminates against poor; no compelling state purpose necessitates state's inequitable method of financing education); *Scott v. Commonwealth*, 247 Va. 379, 386, 443 S.E.2d 138 (1994) (state's system of funding withstands strict scru-

tiny). But others reserve strict scrutiny for equity challenges to statutory schemes that constitute a *denial* of the fundamental right to education; they employ a more forgiving standard of review when their focus is on legislative mechanisms to *fund* exercise of the right. See *Skeen*, 505 N.W.2d at 315-16 (strict scrutiny applies when offered education falls below "adequacy" level; otherwise, Minnesota applies rational basis standard); *Bismarck Public School Dist. 1*, 511 N.W.2d at 257 (North Dakota applies intermediate scrutiny); *Kukor*, 148 Wis. 2d at 498 (Wisconsin applies rational basis standard); see also *Horton v. Meskill, (Horton II)*, 195 Conn. 24, 35-38, 486 A.2d 1099 (1985) (Connecticut adopts three-part analysis for school funding; educational funding "in significant aspects sui generis"); *Seattle School Dist.*, 90 Wash. 2d at 518 (although education "paramount duty," means of discharging duty left to legislature).

In *Bismarck Public School Dist. 1*, 511 N.W.2d 247, the North Dakota Supreme Court held that a fundamental right to education existed under the state constitution. The court declined, however, to adopt strict scrutiny for decisions involving the financing of the educational system. Instead, the court adopted intermediate scrutiny in order to strike a balance between flexibility needed in finance decisions and the importance of the right. 511 N.W.2d at 257-59.

In *Skeen v. State*, 505 N.W.2d 299, 313 (Minn. 1993), the Minnesota Supreme Court found that a fundamental right to education existed because of education's overall importance to the state and an explicit provision in the state constitution mandating a duty to "establish a 'general and uniform system' of education." The court concluded that strict scrutiny should apply only to challenges to adequacy and uniformity in funding the school system, but that particular funding mechanisms should be reviewed under the rational basis standard. 505 N.W.2d at 315-16. The court noted that the state constitution used only the word "shall" in the section describing financing, while the "duty of the legislature" language was used in the section addressing establishment of schools. 505 N.W.2d at 315 n.9. Further, the court stated: "Because the state constitution does not require strict economic equality under the

equal protection clause, it cannot be said that there is a 'fundamental right' to any particular funding scheme . . . ." 505 N.W.2d at 315.

In *Kukor v. Grover,* 148 Wis. 2d 469, 496, 436 N.W.2d 568 (1989), the Wisconsin Supreme Court concluded that " 'equal opportunity for education' is a fundamental right" but concluded that absolute equality in financing was not required. The court noted that the equalization system at issue actually exceeded the degree of uniformity required under the state constitution. 148 Wis. 2d at 496. Holding that the rational basis test rather than strict scrutiny applied to issues based on spending disparities, the court reasoned that spending disparities did not involve the denial of an educational opportunity within the scope of the state constitution. 148 Wis. 2d at 496-98.

When District Judge (now Justice) Luckert wrote her opinion in *U.S.D. No. 373, et al. v. State,* No. 90 CV 2406 (Shawnee County District Court, filed Dec. 16, 1993) (For ease of reference, this slip opinion will be referred to hereinafter as *"U.S.D. No. 229,* slip op."), she looked at all of the school finance opinions from other jurisdictions to that point and concluded that those applying a rational basis standard of review to school finance equity challenges were the most persuasive. *U.S.D. No. 229,* slip op. at 89-92. Those justices who sat on this court at the time the appeal arose in that case adopted Justice Luckert's position, as well as nearly all of her exhaustive and eloquent discussion. *U.S.D. No. 229,* 256 Kan. at 239-51, 261-63.

In my view, the precedential landscape on the appropriateness of a rational basis standard of review for school finance legislation, as opposed to outright denial of the right to an education, has changed little since *U.S.D. No. 229* was decided, and I agree that the cases on which Justice Luckert and the Supreme Court relied remain persuasive on the wisdom of applying that standard to statutes providing for education finance in Kansas. However, I am not comfortable reasoning backward from that conclusion to say there is no fundamental right to education under our Kansas Constitution. In fact, on close reading, it is evident that Justice Luckert was also reluctant to make this backward leap of logic. See *U.S.D. No.*

229, slip op. at 94 ("Further, while there may be a fundamental right to the constitutional guarantee of an education, the legislature met this right and the lesser rational basis standard should be applied to the examination of the equality of the financing."). It was not until the Kansas Supreme Court's opinion in *U.S.D. No. 229* that Justice Luckert's use of a rational basis standard for review of school finance legislation was equated to a conclusion that the Kansas Constitution recognizes no fundamental right to education. See *U.S.D. No. 229*, 256 Kan. at 261 ("Here, the district court exhaustively analyzed decisions from other jurisdictions in concluding that education was not a fundamental right requiring application of the strict scrutiny test in analyzing legislation involving the funding of public education.").

As stated above, if we were to regard *Rodriguez* as controlling on the method for determining the existence of a fundamental right to an education, our Kansas Constitution's explicit education provisions would settle the matter in favor of holding that such a right exists. *Lujan* and like cases are probably correct, however, to question the utility of this approach for the interpretation of state constitutions. See *Lujan*, 649 P.2d at 1017. Like the Colorado Constitution under consideration in *Lujan*, the Kansas Constitution contains several explicit provisions "suited for statutory enactment" that plainly do not give rise to fundamental rights for individuals. See, *e.g.*, Kan. Const. Art. 12, § § 1, 2 (provisions regarding corporations, stockholder liability).

As Justice Luckert recognized, factors that may be considered in addition to the language of a state's education clause include the relationship of that clause to the state constitution as a whole, the state's particular constitutional history, and any perception that the framers intended education to be a fundamental right. See *U.S.D. No. 229*, slip op. at 85-92 (citing *Alabama Coalition for Equity v. Hunt*, No. CV-90-883-R [Ala. Cir. unpublished opinion filed April 1, 1993] [1993 Westlaw 204083]; *Horton I*, 172 Conn. at 653-54 [Bogdanski, J. concurring]; *Washakie Co. Sch. Dist. No. One*, 606 P.2d at 333). In Kansas, all of these factors support the existence of a fundamental right to education.

First, the language of the education article is mandatory. The legislature *"shall* provide for intellectual, educational, vocational and scientific improvement" and it *"shall* make suitable provision for finance of the educational interests of the state."* Kan. Const. Art. 6, § § 1, 6. Neither the provision of progressive educational improvement nor the financing of it is optional.

Second, the education article's relationship to the constitution as a whole emphasizes its centrality to the document's overall design. Only five articles precede it. Each of the first three outlines one of the three branches of government. See Kan. Const. Arts. 1, 2, 3. The fourth and the fifth deal with elections and suffrage, without which the three branches could not be populated. See Kan. Const. Arts. 4, 5. Next comes education; once the branches are established and their seats filled, it appears education is the first thing on the agenda of the new state. See Kan. Const. Art. 6. The education article comes before those dealing with public institutions and welfare, the militia, county and township organization, apportionment of the legislature, and finance and taxation, among others. See Kan. Const. Arts. 7, 8, 9, 10, 11. Our constitution not only explicitly provides for education; it implicitly places education first among the many critical tasks of state government.

Third, our state's constitutional history reinforces the importance of education even before statehood. As noted both by Justice Luckert in her *U.S.D. No. 229* opinion and by District Judge Terry Bullock in his earlier decision in *Mock v. State*, No. 90 CV 918 (Shawnee County District Court, filed Oct. 14, 1991), public schools were significant components of life on the prairie that would become Kansas. In Justice Luckert's words:

"[T]he Organic Act and the Act for the Admission of Kansas Into the Union included provisions providing that certain sections of land be reserved for educational purposes. (The Organic Act, and Act to Organize the Territory of Kansas § 34 (10 Stat. 289, chapter 59, § 34, May 30, 1854)). A Territorial Superintendent fo Common Schools certified teachers and organized local school districts within walking distance of students' homes.

"When passed in 1859, the Ordinance to the Constitution contained eight sections, three of which dealt with elementary public education. The framers of the constitution devoted an entire article to the establishment and finance of a system of 'common schools.' Section 6 of the Ordinance provided for statewide financing

of schools by earmarking five percent of all proceeds from the sale of public lands for the exclusive use of the public schools.

"The original [A]rticle 6 of the Kansas Constitution was adopted by the statehood convention in July 1859, ratified by the electors of the State of Kansas on October 4, 1859, and became law upon the admission of the State into the United States in 186[1]. Section 3 of the [A]rticle 6 provided for funding of public education. Sale of public lands, unclaimed estates, rents on public lands, 'and such other means as the legislature may provide, by tax or otherwise, shall be enviably appropriated to the support of common schools.'

"Hence, from its inception, Kansas has financed public schools through taxes and other mechanisms provided for by the legislature . . . ." *U.S.D. No. 229*, slip op. at 5-6.

See King, C., *The Kansas School System—Its History and Tendencies*, Collections of the Kansas State Historical Society 1909-1910, pp. 424-25.

The relevant original language of our constitution's Article 6 stated:

"§ 2. "The legislature *shall encourage the promotion of* intellectual, moral, scientific and agricultural improvement, by establishing a uniform system of common schools, and schools of a higher grade, embracing normal, preparatory, collegiate and university departments." (Emphasis added.) Kan. Const. Art. 6, § 2 (1859).

This language remained in place until 1966, when Article 6 was amended to its current form. The amendment reaffirmed "the inherent power of the legislature—and through its members, the people—to shape the general course of public education and provide for its financing." *U.S.D. No. 229*, slip op. at 8 (quoting Kansas Legislative Council, *Implementation of the Education Amendment*—Report of the Education Advisory Committee, p. vii [Nov. 1966]). The amendment also revamped administration of the consolidated state system of education, but it did nothing to undercut any individual right to education. In fact, it strengthened the language outlining the legislature's responsibilities. Section 2 of Article 6 of the original constitution became § 1 of Article 6 and now commands: "The legislature *shall provide for* intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools, educational institutions and related activities." (Emphasis added.) Kan. Const. Art. 6, § 1. In addition, new language was inserted in Section 6 of the Article: "The legis-

lature shall make suitable provision for finance of the educational interests of the state." Kan. Const. Art. 6, § 6(b).

Finally, indications are that the framers of our constitution intended education to be a fundamental right. Education was central to Kansas settlers, both pro and antislavery. Early proposed constitutions and the ultimate document, adopted at Wyandotte on July 29, 1859, and ratified October 4 of that year, "reveal the educational spirit of the Kansas pioneer." See King, *The Kansas School System—Its History and Tendencies*, pp. 424-25. Statutes since 1858 enumerated subjects that must be taught in the common schools; after that time, curriculum has been marked by continuous expansion and enrichment. See King, p. 425. As Justice Luckert discussed in *U.S.D. No. 229*, slip op. at 5-6, the Ordinance to the Kansas Constitution passed in 1859 devoted three of its eight sections to elementary public education. And the original and amended constitution not only devoted an entire article to the establishment and finance of a public education system, see *U.S.D. No. 229*, slip op. at 5, the placement of that article and its resulting emphasis suggest that education was considered a high, if not first, priority of state government.

Beyond the factors enumerated in the cases, it is also well worth noting that Justice William J. Brennan discussed the societal and political significance of education in his *Rodriguez* dissent: "[T]here can be no doubt that education is inextricably linked to the right to participate in the electoral process and to the rights of free speech and association guaranteed by the First Amendment." 411 U.S. at 63 (Brennan, J., dissenting); see Blumenson and Nilsen, *One Strike and You're Out? Constitutional Constraints on Zero Tolerance in Public Education*, 81 Wash. U. Q. 65, 99, 102 (Spring 2003).

What was true when Justice Brennan wrote those words in 1973 certainly continues to be true in the early years of the 21st century. Our sister courts have not disagreed, instead recognizing education's overwhelming political and economic importance. See *U.S.D. No. 229*, slip op. at 88 (citing *Lujan*, 649 P.2d at 1017; *Hornbeck*, 295 Md. at 649-50; *Levittown UFSD*, 57 N.Y.2d at 43; *Tennessee Small School Sys. v. McWherter*, 851 S.W.2d 139, 151-

52 [Tenn. 1993]). That a certain level and quality of formal education is necessary for any citizen to function intelligently and productively in our increasingly complex democracy and our shrinking world is not honestly debatable. An individual citizen's right to education at this level and quality is "fundamental" in every imaginable sense of the word. Given the mandatory language of our constitution, the clarity of the historical record, and modern exigencies, how can it be otherwise? Education is vital for each citizen and no less imperative for the survival and progress of our republic.

Of course, once we recognize the existence of a fundamental right to education under our Kansas Constitution, the question is how legislation implicating education *financing* should be reviewed. As I have said, I understand and agree that the rational basis standard of review should apply. Like the Minnesota Supreme Court in *Skeen*, 505 N.W.2d at 313-16, however, I believe there is a theoretical point of no return. At that point, the standard must shift to strict scrutiny. If inequities in a school financing system become so egregious that they actually or functionally *deny* the fundamental right to education to a segment of otherwise similarly situated students, we must be prepared to require more of our legislature than a mere rational basis for its line drawing.

In addition to the reasons outlined in Justice Luckert's *U.S.D. No. 229*, slip op., and adopted by our court for using rational basis review as the usual governing standard in *U.S.D. No. 229*, 256 Kan. 232, Syl. ¶ 7, I believe there are at least two other justifications in school finance cases for deviation from our typical strict scrutiny of alleged violations of a fundamental right.

First, the exercise—indeed, the existence—of an individual's fundamental right to education under the Kansas Constitution is unavoidably dependent at least in part on societal and governmental philosophy and action. Unlike, for example, the right to free speech or the right to privacy, which are inherent in the humanity of any individual and thus cannot be infringed by the government, see *Gilbert v. Minnesota*, 254 U.S. 325, 332, 65 L. Ed. 287, 41 S. Ct. 125 (1920) (right to free speech natural, inherent); *Lawrence v. Texas*, 539 U.S. 558, 573-74, 156 L. Ed. 2d 508, 123 S. Ct. 2472 (2003) (right to privacy discussed; choices "central to personal dig-

nity and autonomy" protected from government interference) (citing *Planned Parenthood of Southwestern PA. v. Casey*, 505 U.S. 833, 846-47, 120 L. Ed. 2d 674, 112 S. Ct. 2791 [1992]), the right to education is at least in part a function of the way in which our society and other societies of the world have chosen to order and govern themselves and to prepare citizens for full political and economic participation. No child but the most exceptional is capable of educating himself or herself completely independently to the level and quality assured by the fundamental right. Some governmental assistance or intervention is required. State government, through the legislature, is a guarantor and facilitator of the exercise of the right as well as a potential source of interference with it. When the government must be involved, as it must be here, and that involvement demands investment of resources purchased at some cost to taxpayers, it is logical and reasonable that the legislature should be more free than the specter of strict scrutiny would allow it to be when it makes policy choices. Even under rational basis review, however, the judiciary retains its power to decide whether legislative choices make educational sense, *i.e.*, whether they comport with the overall constitutional mandates that the legislature "provide for intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools, educational institutions and related activities" and "make suitable provision for finance of the educational interest of the state." Kan. Const. Art. 6, § § 1, 6.

Second, I agree that rational basis review has much to recommend it when a case reaches a remedial phase, *i.e.*, when we are called upon to judge the adequacy and efficacy of the legislature's efforts to correct constitutional problems identified by the courts. See *U.S.D. No. 229*, slip op. at 92-95 (discussing Connecticut's approach in *Horton v. Meskill* [*Horton III*], 195 Conn. 24, 486 A.2d 1099 [1985]).

For all of the foregoing reasons, I concur in the judgment and most of the rationale of my colleagues. I respectfully disagree with their view that education is not a fundamental right under the Kansas Constitution. It is. Justice Luckert never held otherwise in *U.S.D. No. 229*, slip op. This court should not have jumped to that

regressive conclusion then, and it should not reinforce that error now.

DAVIS, J., joins in the foregoing concurring opinion.

LUCKERT, J., concurring: I concur fully in the result of the majority of the court and most of its rationale. However, I would find that education is a fundamental right under the Kansas Constitution. In this regard, I agree with Justice Beier's analysis of this issue.

As Justice Beier indicates, I addressed this issue when acting as the trier of fact in *U.S.D. No. 373, et al. v. State,* No. 90 CV 2406 (Shawnee County District Court, filed Dec. 16, 1993) (Slip op.), but did not state a conclusion of law regarding whether there was a fundamental right to education under the Kansas Constitution. Rather, as does Justice Beier, I cited the analysis of opinions such as *Skeen v. State,* 505 N.W.2d 299, 313 (Minn. 1993), and *Kukor v. Grover,* 148 Wis. 2d 469, 496, 436 N.W.2d 568 (1989), and left open the issue stating that "there may be a fundamental right." (Slip op. at 94). Despite this language in the trial court decision, the Supreme Court interpreted my conclusions of law to include a determination that education was not a fundamental right. Further, the Supreme Court, at least impliedly, reached that conclusion. *U.S.D. No. 229 v. State,* 256 Kan. 232, 261-63, 885 P.2d 1170 (1994). Respectfully, I disagree with that conclusion and would adopt the rationale set forth in Justice Beier's concurring opinion, emphasizing the unique nature of Article 6, in which Kansas citizens mandate legislative action and then define the scope of the required action. See Article 6, § 1 ("The legislature shall provide for intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools."); Article 6, § 6(b) ("The legislature shall make suitable provision for finance of the educational interests of the state.").