NOT DESIGNATED FOR PUBLICATION

No. 124,349

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of
K.H., K.R.T., and K.J.T.,
Minor Children.

MEMORANDUM OPINION

Appeal from Shawnee District Court; RACHEL L. PICKERING, judge. Opinion filed August 19, 2022. Affirmed.

*Jennifer Martin Smith*, of Alderson, Alderson, Conklin, Crow & Slinkard, L.L.C., of Topeka, for appellant natural mother.

*Morgan L. Hall*, deputy district attorney, for appellee.

*Dwight R. Carswell*, deputy solicitor general, and *Derek Schmidt*, attorney general, for intervenor.

Before ISHERWOOD, P.J., SCHROEDER and WARNER, JJ.

PER CURIAM: The appellant—the natural mother of three minor children—challenges the district court's decision to terminate her parental rights. The court found that the appellant, to whom we refer as Mother, was unfit to parent the children based on several statutory factors. The court also found that the circumstances that rendered Mother unfit were unlikely to change in the foreseeable future and that terminating her rights was in the children's best interests. Mother challenges these determinations. Also, for the first time on appeal, Mother, who is Black, claims that the State's caseworkers violated her right to equal protection of the law because they disproportionately seek to terminate the parental rights of Black parents when compared with other racial or ethnic groups.

1

After carefully reviewing the evidence and the parties' arguments, we find that the district court's termination decision is supported by sufficient evidence in the record. Though this evidence was contested, it is not the role of this court to reweigh the evidence or reassess witnesses' credibility, especially when appellate judges are not present to hear testimony or observe witnesses' demeanor. And Mother has not provided a sufficient explanation why—or evidentiary lens through which—we can review her new equal-protection challenge. We thus affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

This appeal presents the second opportunity to review the sad facts giving rise to the termination of Mother's parental rights. In August 2015, police took K.T., K.H., K.R.T., and K.J.T.—who were then between three and nine years old—into protective custody after school officials discovered marks and cuts on K.R.T.'s back. Mother later admitted to hitting her son. The State filed criminal charges against Mother and petitioned for the children to be adjudicated children in need of care.

Mother pleaded no contest to reduced charges and received a 19-month prison sentence. In November 2015, Mother did not contest, and the district court found, that the children were in need of care. Because her eldest daughter, K.T., was eventually reintegrated with her father, this case only concerns Mother's other children—her son, K.R.T., and her younger daughters, K.H. and K.J.T.

Mother worked with KVC Behavioral Healthcare—a contractor for the Kansas Department for Children and Families overseeing Mother's case—towards reintegration. As part of this process, KVC required Mother to complete various case-plan goals. Relevant here were Mother's goals of completing a parenting class, demonstrating

2

parenting skills from the class, obtaining a mental-health assessment, and following the assessment's recommendations.

The record demonstrates that two main concerns hindered reintegration: the caseworkers' perception of Mother's demeanor and the children's behavior. Mother completed a parenting class while she was incarcerated. She was released from prison in October 2016; after her release, she began having supervised—and later unsupervised—visits with her daughters, K.H. and K.J.T.

Mother's interactions with those involved in the case were not always positive. KVC staff described Mother as abrasive. When her behavior escalated, it did so quickly; she became hostile, loud, and verbally aggressive, and caseworkers had difficulty redirecting her back to the task at hand. These episodes often intimidated staff and affected others visiting the KVC office. To better help Mother and staff, in mid-2017, KVC assigned a permanency supervisor as Mother's case manager.

KVC at times required Mother to leave the office—sometimes by threatening to call the police. KVC also restricted when she could arrive at the office. Others involved in the case responded similarly to Mother's behavior. A therapist that treated Mother's son described hanging up when Mother yelled at her on the phone. Similar incidents occurred in late 2019 and early 2020 involving the guardian ad litem; the guardian eventually told Mother's attorney that Mother was not to call the office again. And in late 2020, the school that Mother's son attended told her attorney that Mother could not contact the school by phone because of her behavior.

Throughout the case, Mother also made concerning statements about corporal punishment. When confronted with her son's injuries in 2019, Mother stated that she believed "whooping" K.R.T. was an appropriate form of punishment. Mother made similar statements later in the case, such as explaining that she, as a Black parent,

3

punished her son the way Black parents discipline their children. These comments led those involved in Mother's case to question whether she understood the severity of her actions.

The children also displayed troubling behaviors. K.J.T. struggled with anger issues and acted out at school by stealing, cheating, and lying, while K.H. generally acted out only at home by throwing tantrums. The girls' therapist believed these actions were responses to stressors and noted that the daughters improved over time. But the girls' foster parents reported that they became disobedient after unsupervised visits with Mother. K.J.T. and K.H. were eventually diagnosed with oppositional-defiance disorder—defiance even when directions have no consequences. To manage these behaviors, the daughters' therapist explained that they needed a caregiver who understands their diagnoses and can provide structure, routine, and positive reinforcement; without this, their behaviors would further deteriorate.

Mother's son, K.R.T., had more severe behavioral issues than his sisters. He struggled with anger, which he expressed through severe tantrums, aggression (such as biting, hitting, and throwing plates), and intimidation. He experienced nightmares about Mother, which his therapist attributed to situations that occurred when he lived with her. And he skipped school. Though these behaviors decreased as he attended therapy, they increased when the possibility of visiting Mother was mentioned. To prevent K.R.T.'s behavior from escalating, his therapist recommended visits with Mother only when she neared completing her case-plan goals.

In mid-2017, Dr. Stephen Hazel administered mental-health evaluations for K.R.T. and Mother:

- Dr. Hazel diagnosed K.R.T. with autism-spectrum disorder and believed his emotional and behavioral problems likely stemmed from that condition. Because

4

of his autism, K.R.T. would need ongoing treatment, a supportive environment, and a caregiver who could calmly and patiently respond to his behavior without using physical punishment.

- Dr. Hazel noted Mother was very sensitive and reacted strongly to negative criticism and being treated unfairly or poorly. He diagnosed her with intermittent-explosive disorder—when a person's emotional responses are disproportionate to the situation. Dr. Hazel recommended Mother attend individual therapy, anger-management classes, and learn specific techniques to parent a child with autism.

In August 2017, Mother was imprisoned after being arrested for and charged with multiple crimes, derailing her reintegration efforts. Following her arrest, the State moved to terminate Mother's parental rights. Mother eventually pleaded guilty to felony interference with a law enforcement officer and two drug-related misdemeanors, possession of marijuana and unlawful use of drug paraphernalia. Her 16-month prison sentence was suspended, and she was granted a 12-month probation term.

After her release, KVC attempted to help Mother complete her case-plan tasks and comply with Dr. Hazel's recommendations. Because Mother did not have insurance, KVC referred her to Valeo Behavioral Health Care, which has a sliding payment scale, for individual therapy. Even so, Mother did not attend any individual therapy appointments. She did begin to attend family therapy sessions with her daughters, which replaced her unsupervised visits with them.

The district court held a hearing on the State's termination motion in June 2018. Mother did not appear at that hearing, and the district court entered a default judgment terminating her parental rights. KVC told Mother's daughters about the termination in September. Mother appealed, and the next year, the Court of Appeals reversed the termination order, finding the entry of the default termination without any evidence by

the State violated Mother's due-process rights. *In re K.H.*, 56 Kan. App. 2d 1135, 444 P.3d 354 (2019). The appellate mandate issued, and the case continued—now four years into the proceedings.

On remand, the district court ordered KVC to refer Mother to individual therapy and for the guardian ad litem to organize family therapy for Mother and her children. KVC also requested that Mother attend an anger-management class and, based on Dr. Hazel's recommendations, attend parenting classes geared towards parenting a child with autism. To determine whether family therapy would be appropriate, the therapist for Mother's son requested that Mother first complete individual therapy.

Though KVC informed Mother about therapy at Valeo, she wanted to complete individual therapy through a different provider. Between late 2019 and January 2020, Mother attended six individual therapy sessions through Stormont Vail, paid for by KVC. She also completed anger-management classes in January. Although she completed these courses, Mother was unhappy with both. She asserted that her therapist focused on helping her adjust to losing her children, rather than succeeding in reintegration. And she claimed that Stormont Vail did not perform the family-therapy recommendations that KVC wanted. Accordingly, Mother's therapist could not make a recommendation about family therapy. Mother's case manager and the therapists for her son and daughters contacted the guardian ad litem, reporting their concerns with family therapy—such as the son's behaviors, topics to avoid, and the confusion that the remanded case would create.

In February 2020, the guardian ad litem filed a motion stating family therapy was not in the children's best interests, and the district court subsequently issued a no-contact order preventing Mother from seeing her children. Shortly afterward, the State filed a new motion to terminate Mother's parental rights. Due to the COVID-19 pandemic, the hearing was rescheduled and ultimately held in December.

At the hearing, Mother admitted that in 2015, she hit her son with a belt because he was playing with cleaning supplies. She stated that she understood what she had done was wrong. She also stated that while incarcerated in 2016, she talked to her daughters every day. And though she wanted to continue with individual therapy, she could not afford to do so. As for her behavior, Mother explained that KVC had misunderstood her frustration as anger-management issues; she noted that this case had triggered her frustration because KVC had not treated her with respect, and she thought that those triggers would no longer exist upon reintegration.

In May 2021, the district court terminated Mother's parental rights. The court found several factors, both individually and collectively, rendered Mother unfit to parent her three children. It also concluded Mother's unfitness would continue for the foreseeable future and that termination was in the children's best interests. Mother appeals.

DISCUSSION

A parent has a constitutionally protected liberty interest in the relationship with his or her children. *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Thus, before terminating parental rights, Kansas law requires a district court to find the State has proved that the parent is unfit, that the conduct or condition that renders the parent unfit is unlikely to change in the foreseeable future, and that termination of parental rights is in the children's best interests. K.S.A. 38-2269(a), (g)(1). Because of the fundamental nature of this right, any findings relating to a parent's unfitness must be proved by clear and convincing evidence. K.S.A. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

When reviewing a finding of parental unfitness, this court must determine, after considering all the evidence in a light favoring the State, whether the evidence is sufficient to support the court's decision—that is, whether a rational fact-finder could have found it highly probable that the parent was unfit. *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4. We do not reweigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705.

After finding a parent unfit—both at the time of the termination hearing and for the foreseeable future—the district court must determine if termination of parental rights is "in the best interests of the child." K.S.A. 38-2269(g)(1). This assessment gives "primary consideration to the physical, mental and emotional health of the child." K.S.A. 38-2269(g)(1). Because determining what is in a child's best interests is inherently a judgment call, we will only overturn a district court's best-interests determination when it constitutes an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2. A district court exceeds its broad latitude if it rules in a way no reasonable person would have under the circumstances, ignores controlling facts or relies on unproven factual representations, or acts outside the appropriate legal framework. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017).

Mother challenges the district court's termination decision in three ways. She raises a procedural challenge to the district court proceedings, claiming the district court erred when it considered the written closing arguments the State filed after the court-imposed deadline. She also asserts that the evidence was insufficient to support the district court's findings relating to her fitness as a parent. And, for the first time on appeal, Mother argues the statute governing the termination of parental rights—K.S.A. 38-2269—violates the Equal Protection Clause because it has been applied in a way that disparately impacts Black parents. We affirm the district court's decision.

1. *Mother's challenge to the timeliness of the State's closing arguments is not preserved for appellate review.*

As a preliminary procedural matter, Mother argues the district court abused its discretion when it considered the State's written closing arguments, which were submitted almost two months after the court-ordered deadline. Though Mother did not object to the timeliness of these submissions at the time, she now asks this court to strike the State's untimely submissions and remand the case to the district court to reconsider the case without those arguments.

As background, following the close of evidence at the termination hearing, the district court asked Mother and the State to submit written closing arguments by December 23, 2020. Mother submitted her closing arguments by that date. But for reasons unclear from the record, the State did not submit its arguments until two months later. Mother did not object to the timeliness of the State's submissions when they were submitted or otherwise seek to strike the filing. When the court issued its ruling in May, its written memorandum decision referenced the State's closing arguments three times.

Though Mother did not challenge the timeliness of the State's written submissions before the district court, she now requests this court strike those closing arguments from the record. We appreciate Mother's consternation at the State's late filing. But if Mother believed that the State's filing was improper, she should have raised this claim to the district court, which has broad discretion to accept or reject untimely filings. See, e.g., *State v. Bridges*, 297 Kan. 989, 998, 306 P.3d 244 (2013) (court's decision to exclude testimony from untimely-identified expert reviewed for abuse of discretion). Because Mother did not raise the issue, the district court here was never given the opportunity to exercise that discretion. And Mother fails to explain why or how we can evaluate the effect of the State's submissions for the first time on appeal in the absence of the district court's evaluation. See Supreme Court Rule 6.02(a)(5) (2022 Kan. S. Ct. R. at 35). We decline to consider this issue further.

2. *The district court's decision is supported by sufficient evidence in the record.*

Mother primarily argues that there was not sufficient evidence presented at the termination hearing to support the district court's termination decision. She argues that, on balance, the evidence did not show that she is an unfit parent or will remain unfit for the foreseeable future. And she claims that terminating her parental rights is not in the children's best interests.

K.S.A. 38-2269 contains a nonexhaustive list of factors indicative of unfitness. Depending on the circumstances, the existence of any single factor may be sufficient to terminate parental rights. K.S.A. 38-2269(b), (f). Here, the district court based its termination decision in this case on K.S.A. 38-2269(b)(1), (4), (5), (7), and (8), as well as K.S.A. 38-2269(c)(2) and (3). The evidence in the record supports these findings.

The record supports the district court's finding under K.S.A. 38-2269(b)(1) that Mother suffered from mental or emotional illness that rendered her unable to care for her children's needs. Dr. Hazel diagnosed Mother with intermittent explosive disorder in 2017, and after completing therapy and anger-management classes in January 2020, she still exhibited aggressive episodes. Several people corroborated Mother's aggressiveness, which persisted throughout the case, even after Mother completed anger-management classes and individual therapy sessions. K.R.T. especially requires a caregiver who is calm and patient, and Mother's daughters need someone who understands their diagnoses and can provide positive reinforcement. Mother's consistent aggressiveness casts serious doubt on her ability to provide for the children's needs. And her aggressiveness towards people involved in her case suggests she may be unable to cooperate with those who would treat her children.

10

The record also includes evidence of Mother's physical abuse of K.R.T. and K.J.T., which gave rise to her 2015 convictions of attempted abuse of a child and aggravated battery. See K.S.A. 38-2269(b)(4) ("physical, mental or emotional abuse or neglect or sexual abuse of a child"). Other panels have found a parent unfit based on a single instance of abuse. See *In re H.E.*, No. 120,107, 2019 WL 1496126, at *3 (Kan. App. 2019) (unpublished opinion); *In re A.M.*, No. 116,986, 2017 WL 3001353, at *1, 4-5 (Kan. App.) (unpublished opinion), *rev. denied* 307 Kan. 986 (2017). And Mother's statements to various caseworkers—that her excessive corporal punishment is a valid form of discipline—call into question whether she appreciates the gravity of her actions.

Mother's convictions of these abuse-related offenses, as well as multiple other crimes showing violence or aggression while this case was pending, underscored her aggressive tendencies. See K.S.A. 38-2269(b)(5) ("conviction of a felony and imprisonment"). The record supports the district court's conclusion that these tendencies led to criminal convictions, as well as the court's assessment that Mother had not taken appropriate steps to curb her anger.

And the record also supports the district court's assessment that Mother failed to complete or participate in multiple therapy sessions or otherwise take steps to conform her actions to meet the case-plan goals. Most notably, Mother did not make significant changes to allow her to support K.R.T. in light of his autism diagnosis. See K.S.A. 38-2269(b)(8) ("lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child"); see also K.S.A. 38-2269(c)(2) ("failure to maintain regular visitation, contact or communication with the child or with the custodian of the child"). The district court contrasted Mother's efforts and actions throughout the case with the State's efforts toward rehabilitation, such as referring Mother for therapy. See K.S.A. 38-2269(b)(7); K.S.A. 38-2269(c)(3).

In her appeal, Mother highlights evidence that she believes undercuts the district court's conclusions. For example, to counteract the district court's findings regarding Mother's mental and emotional health, as well as her anger-management challenges, Mother claims that the caseworkers involved in her case stereotyped her as an "angry Black woman" and unfairly built a case around that narrative. Accord Ashley, *The Angry Black Woman: The Impact of Pejorative Stereotypes on Psychotherapy with Black Women*, 29 Soc. Work in Public Health 27 (2014). She points out that one of the incidents where she became particularly angry occurred when K.R.T.'s speech-language pathologist stated in a report that K.R.T. had "some African American dialect" but that the caseworkers would not "hold that against him." Mother became upset with the choice of language and began yelling. Mother uses this example to question whether her multiple diagnoses arose from cultural biases rather than proper psychological evaluation. Mother also seeks to downplay the episode of physical abuse that led to her convictions in 2015 and the initiation of this action. She points out that there have not been other allegations of physical abuse since that time, and she notes that parents can choose to discipline their children through corporal punishment, so long as it is not abusive or "'cruel and inhuman.'"

While we can understand Mother's frustration with the speech pathologist's choice of language, we do not find these arguments persuasive. The evidence in this case was contested, and the district court judge—who considered all the evidence presented, listened to the witnesses, and evaluated their credibility—did not find Mother's version of the events compelling. This includes Mother's allegations that the various allegations against her were rooted in cultural or racial biases. Our review of the district court's thoughtful opinion demonstrates that the judge took these allegations seriously but found, based on the evidence presented, that they were without merit. It is not the role of an appellate court to reweigh the evidence.

Moreover, we note, as did the district court, that many of Mother's arguments align with the State's concerns as to whether she appreciated the gravity of her actions and their impact on the children. Rather than recognizing the harms of her emotional reactions and the challenges those reactions pose to parenting three children (one with autism-spectrum disorder) and seeking assistance, Mother asserts that the caseworkers, therapists, and guardian ad litem have unfairly characterized her actions. And Mother fails to appreciate the gravity of her previous physical abuse of her children, which led to a felony conviction and imprisonment—she incorrectly equates her felonious and excessively violent actions with corporal punishment generally. In short, both the evidence in the record and Mother's arguments on appeal support the district court's assessment that Mother has failed to recognize the consequences of her actions.

After carefully and thoroughly reviewing the record, we conclude that the evidence is sufficient to support the district court's findings regarding Mother's unfitness as a parent. The record also supports the court's finding that this unfitness will continue for the foreseeable future. This case has been pending for about seven years. Yet Mother has not taken steps during that time to address her anger or her difficulty working with others through therapy. Mother has been convicted of multiple criminal offenses, including offenses consistent with anger-management difficulties. And the district court found that there was no credible evidence that showed Mother had taken meaningful steps to learn about parenting a child with autism. In short, Mother's actions do not suggest that her unfitness will change in the foreseeable future.

For similar reasons, the district court did not err when it found that terminating Mother's parental rights was in the best interests of K.R.T., K.J.T., and K.H. At the time of termination, this case was over five years old. During that time, Mother only briefly visited her son and had not seen her daughters since June 2018. K.R.T. and K.J.T. have spent a little less than half their lives in foster care, while K.H. has spent more than half her life away from Mother. As the district court indicated in its order, Mother was not in

13

a position to offer the children the support they need, particularly considering their mental-health challenges. The evidence at the hearing showed that these conditions were better addressed when the children were placed outside Mother's care. The district court did not abuse its discretion by finding termination to be in the children's best interests.

3. *Mother's equal-protection challenge is not preserved for appellate review.*

In her final argument on appeal, Mother asserts that the manner in which the State has applied K.S.A. 38-2269 violates the constitutional guarantee of equal protection under the law because it unfairly impacts Black parents. See U.S. Const. amend XIV, § 1; Kan. Const. Bill of Rights, § 2; see also *Rivera v. Schwab*, 315 Kan. 877, Syl. ¶ 4, 512 P.3d 168 (2022) (Section 2 of the Kansas Constitution Bill of Rights and the Fourteenth Amendment's Equal Protection Clause provide the same protection.). Mother acknowledges that she did not raise this issue before the district court, but she asserts that this court should take up the question for the first time on appeal because her claim involves a fundamental right and racial disparities.

An appellate court will not generally address claims raised for the first time on appeal. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). Thus, Mother must persuade this court that her claim falls under an exception to this preservation rule and warrants consideration without a district court record. In other words, Mother must convince us that her equal-protection claim "involves only a question of law arising on proved or admitted facts" or that consideration of this claim "is necessary to serve the ends of justice or to prevent the denial of fundamental rights." *State v. Perkins*, 310 Kan. 764, Syl. ¶ 2, 449 P.3d 756 (2019). We find that this claim is not properly before us.

Contrary to Mother's assertions on appeal, constitutional questions do not always involve purely legal determinations. Instead, these claims often require considerable factual development. In particular, to challenge a facially neutral law on equal-protection

grounds based on a disparate impact, the challenging party must prove the law has a discriminatory effect and was enacted with a discriminatory purpose. *Miller v. Johnson*, 295 Kan. 636, 666, 289 P.3d 1098 (2012), *abrogated on other grounds by Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 442 P.3d 509 (2019); *Montoy v. State*, 278 Kan. 769, 771, 120 P.3d 306 (2005). Both determinations require factual development—to determine the extent to which the law, or application of the law, is impacting one group differently, and then to determine the motivation behind any differential treatment. Mother cites various sources opining that, on a national level, Black children are more likely to enter foster care and Black parents are more likely to have their parental rights terminated. But she has not shown this to be true in Kansas. Nor has the State had any opportunity to present evidence that may be tested and weighed by a finder of fact.

Without this evidentiary submission and assessment, the record does not permit us to meaningfully review Mother's equal-protection challenge. Under these circumstances, we conclude that Mother has failed to show that an exception to our preservation requirement justifies our review of this constitutional issue. Accordingly, we invoke the general rule that constitutional issues may not be raised for the first time on appeal and decline review. See *Daniel*, 307 Kan. at 430.

Affirmed.